## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MUTUAL MINDS, LLC, a California limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> TRON SHELLY, an individual; RICK MILLER, an individual; iDRIVE INTERACTIVE, LLC, a Pennsylvania limited liability company; PARENTS FOR CHEAPER LIVING, LLC, a Virginia limited liability company; and DOES 1 through 10, inclusive, <br><br> Defendants. | CASE NO. 16-cv-00541-JEJ <br><br> <u>**JURY TRIAL DEMANDED**</u> |

## FIRST AMENDED COMPLAINT

NOW COMES Plaintiff, Mutual Minds, LLC, by and through its undersigned attorneys, and files this First Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a)(1)(B) and this Court's order entered at ECF No. 22.

## INTRODUCTION

1.      Defendants Tron Shelly, Rick Miller, Parents for Cheaper Living, and iDrive Interactive steal, convert, copy, and misuse proprietary information that their customers entrust to them so that they can divert profits away from the customers they agreed to service to themselves instead.  In this case, Shelly, Miller, Parents for Cheaper Living, and iDrive devised and implemented a scheme whereby they abused

their business relationship with plaintiff Mutual Minds to unlawfully create competing websites and steal business away from Mutual Minds.  Specifically:

a.   iDrive, led by Shelly and Miller, provided ads to Mutual Minds for posting on websites owned by Mutual Minds;

b.   iDrive agreed to pay Mutual Minds for actions taken by consumers, such as purchases, resulting from the iDrive ads placed on Mutual Minds' websites (the actions are also known as "conversions" and the rate at which ads result in conversions is known as the "conversion rate");

c.   During this process, iDrive, Shelly and Miller learned which ads had the highest conversion rates, *i.e.* which ads generated the most revenue, in conjunction with unique attributes of Mutual Minds websites;

d.   iDrive improperly, and initially covertly and with the intent to avoid detection, accessed one or more Mutual Minds websites to determine which Mutual Minds websites resulted in the highest conversion rates, and which features of those websites resulted in the highest conversion rates;

e.   Having obtained the conversion rates and other Mutual Minds trade secrets below, and then having visited the Mutual Minds

sites, iDrive, at the direction of Shelly or Miller or both, then copied the best performing Mutual Minds websites and features, and created competing websites and at least one competing entity (Parents for Cheaper Living), by using the conversion rates and other trade secrets identified below;

f.   The defendants would not have been able to create competing sites or Parents for Cheaper living without receiving and misusing the conversion rates and other trade secrets; and

g.   As a result, defendants diverted business and web traffic away from Mutual Minds to iDrive instead and caused substantial actual affiliate network confusion.

2.   Defendants cannot and do not deny these facts. Foremost, in or around the summer of 2014, Miller and perhaps other iDrive principals, suggested that iDrive create competing websites using trade secret and other information that Mutual Minds entrusted to them for the sole purpose of growing the business of Mutual Minds. Indeed, in or around June 2014, Shelly then openly admitted that he or someone else at iDrive copied one or more Mutual Minds websites but that there was nothing Mutual Minds could do about it. Shelly is wrong, and his, Miller's, Parents for Cheaper Living's, and iDrive's brazen decision to steal, convert, and

misuse Mutual Minds' proprietary information results in the claims for relief against defendants asserted below.

## **PARTIES**

3.     Plaintiff Mutual Minds is a limited liability company organized and existing under the laws of California with its principal place of business located at 1014 S. Westlake Blvd., Ste. 14227, Westlake Village, California 91361.

4.     Defendant Tron Shelly is an iDrive officer or member.  Mutual Minds is informed and believes, and based thereon alleges, that Shelly is a Pennsylvania resident.

5.     Defendant Rick Miller is an iDrive officer or member.  Mutual Minds is informed and believes, and based thereon alleges, that Miller is a Pennsylvania resident.

6.     Defendant iDrive Interactive, LLC is a limited liability company organized and existing under the laws of Pennsylvania with its principal place of business located at 3909 Hartzdale Drive, Suite 907, Camp Hill, Pennsylvania 17011.

7.     Defendant Parents for Cheaper Living, LLC ("PCL") is a limited liability company organized and existing under the laws of Pennsylvania with its principal place of business located at 4006 Victory Blvd. Suite J #123, Portsmouth, Virginia 23701.

8. Mutual Minds is ignorant of the true names and capacities of defendants sued herein as Does 1 through 10, inclusive, and therefore sues these defendants by such fictitious names. Mutual Minds will amend this complaint to allege their true names and capacities when ascertained. Mutual Minds is informed and believes, and based thereon alleges, that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that Mutual Minds' damages as herein alleged were actually and proximately caused by their conduct. Mutual Minds is informed and believes, and based thereon alleges, that, similar to defendants Shelly, Miller, iDrive, and PCL, the fictitiously named defendants maintain some ownership right, title, or interest in iDrive and acted in their individual capacity to cause harm to Mutual Minds. Mutual Minds is informed and believes, and based thereon alleges, that at all times material hereto, each defendant has authorized, approved, ratified and/or endorsed the acts of each remaining co-defendant.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to Article III, § 2, of the United States Constitution and 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs as alleged more fully below.

10.     The Court has personal jurisdiction over Shelly because Shelly is a resident and citizen of Pennsylvania.

11.     This Court has personal jurisdiction over Miller because Miller is a resident and citizen of Pennsylvania.

12.     This Court has personal jurisdiction over iDrive because iDrive is a Pennsylvania limited liability company with its principal place of business in Pennsylvania.   Based on information and belief, iDrive's sole members are Pennsylvania residents.  Thus, iDrive is a Pennsylvania citizen.

13.     This Court has personal jurisdiction over PCL because PCL is a Pennsylvania limited liability company doing business in Pennsylvania.  Based on information and belief, PCL's sole members are Pennsylvania residents.  Further, PCL is an affiliated or related company with iDrive (a Pennsylvania citizen) according to defendants' first motion to dismiss.

14.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because defendants are residents of Pennsylvania, and defendants are residents of this district or their members are residents of this district.  Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Mutual Minds' claims occurred in this judicial district.

## FACTS COMMON TO ALL COUNTS

**A.   Mutual Minds Entrusts Trade Secrets to Defendants for Defendants to Perform Services**

15.    Mutual Minds creates and develops online communities for people that have common interests and provides those individuals with content targeted to their demographic, including resources, benefits, and discounts.  For example, Mutual Minds created the website spaoa.org, or "We," which is a site that provides information and resources for single parents.  Membership in these online communities is free for consumers, and all of the traffic driven to these websites is generated solely by Mutual Minds.

16.    Mutual Minds partners with advertising networks to place ads on Mutual Minds websites.  When a user or member (that is, a website visitor) responds to such an ad and engages in an action or conversion (such as a purchase), Mutual Minds receives a portion of the revenue it generates for its affiliate network partners and their advertiser clients.  Thus, Mutual Minds depends on website visitors and members to generate revenue for itself.

17.    With respect to online communities targeting the parent sector, Mutual Minds is widely regarded as an industry founder and current industry leader.

18.    From approximately 2011 to 2014, Mutual Minds partnered with iDrive, an advertising network, to post ads on several online communities Mutual Minds created for demographics such as single parents (http://spaoa.org) and

expecting parents (americanhoperesources.com), among others communities (collectively referred to herein as the "Websites").  Under this arrangement, ads provided by iDrive would be posted on Mutual Minds websites for users to view and click.  When a user clicks on an ad and completes a purchase or other conversion, iDrive would remit to Mutual Minds a portion of the revenue generated for iDrive's advertiser-clients as a result of that user action.

19.    iDrive alleges that Mutual Minds partnered with iDrive as described in the preceding paragraph pursuant to a 2010 or 2011 contract that iDrive filed with its motion to dismiss in this action but appropriate personnel at iDrive do not recall seeing that agreement until iDrive filed it in this litigation.  Thus, a factual dispute exists as to whether this agreement between Mutual Minds and iDrive existed, and if so when and on what terms.

20.    In connection with their relationship with Mutual Minds, defendants were entrusted with, were granted access to, and gained knowledge of, Mutual Minds' trade secret, confidential, and proprietary information (collectively, the "Trade Secrets").  The Trade Secrets include, but are not limited to, a detailed description of Mutual Minds' target demographics, information regarding Mutual Minds members, such as members' unique IP addresses and detailed information regarding member preferences and the types of advertisements most likely to lead to sales as reflected in conversion rates, earnings-per-click data, complete

questionnaire information for each member that converted into a sale, and back-end enrollment statistics.  Thus, Mutual Minds entrusted iDrive and the individual defendants with specific and proprietary information about the exact audiences that Mutual Minds targeted, what types of advertisements made such audiences react and drive conversions, and how the unique features Mutual Minds developed for its sites leads to significant revenue generation.  Accordingly, these Trade Secrets included and revealed to defendants the conversion rates associated with the ads, that is, which ads generated the most revenue as a result of their placement on the Websites and the content on the Websites.

21.    Mutual Minds generated the Trade Secrets information through its own testing, know-how, and efforts related to website design, content placement, advertisement placement, and other things, and such information was not submitted by end-user customers (or at least it much of it was not submitted to iDrive) both before and during its relationship with iDrive.  Much if not all of the information also was not received from iDrive, and was not generated by iDrive inasmuch as Mutual Minds developed and generated much of it through its sites without iDrive or any of the defendants.  In fact, iDrive was not the exclusive provider of advertisements and thus iDrive necessarily did not generate the Trade Secrets.

22.    Based on the organic traffic Mutual Minds developed and generated on its various online communities using its Trade Secrets and other things, the iDrive

advertisements posted on Mutual Minds' Websites grossed hundreds of thousands of dollars for iDrive and the individual defendants. .

23.    Although the Websites themselves are public, the Trade Secrets, including the conversion rates and how Mutual Minds developed the, are not. The Trade Secrets are only known to defendants by reason of iDrive's relationship with Mutual Minds. Thus, the Trade Secrets were only disclosed to defendants to be used in connection with iDrive's delivery of ads to Mutual Minds, and defendants were not authorized to use or disclose the Trade Secrets for any other purpose. Mutual Minds only provided the Trade Secrets, including the conversion rates, with the expectation and understanding that such information would be confidential, and never believed that iDrive or other defendants would use the conversion rates or other Trade Secrets to create competing websites or companies.

24.    The Trade Secrets were developed through Mutual Minds' expenditure of significant time, effort, money, and resources, and have substantial economic value in that the use of the information has enabled Mutual Minds to build a successful business and identify and fill the needs of their members better than their competitors. Indeed, disclosure of conversion rates and the other Trade Secrets, including the unique characteristics of the Websites that public visitors could not discern, would allow competing marketers to copy the Websites and then dilute the revenues generated from them. Thus, the Trade Secrets are not publicly available

and were a competitor to gain unauthorized access to them, they would provide a significant and unfair competitive advantage to the competitor to the detriment of Mutual Minds.  Accordingly, at all relevant times, Mutual Minds took measures to protect the Trade Secrets, including storing the information on secure, password protected servers, implementing policies preventing unauthorized disclosure to third parties, and restricting access to the Trade Secrets to only those with a need to know.

**B.    Defendants Steal, Convert, and Misuse Mutual Minds Trade Secrets**

25.    In or around the summer of 2014, iDrive held an internal meeting at which Rick Miller, co-founder and President of iDrive, suggested that iDrive copy the Websites.  Copying the websites could only occur by using the Trade Secrets; otherwise, copying the sites would have no purpose because the Trade Secrets enabled Miller, Shelly and iDrive to understand what made the Mutual Minds websites generate revenue.

26.    At the time of the meeting referenced in the preceding paragraph, iDrive acted as an advertising network partner for Mutual Minds.  But instead of acting as a loyal partner, defendants engaged in a systematic, illicit, and underhanded campaign to copy Mutual Minds' successful model and poach Mutual Minds' process, look, and design, as well as web traffic and other things that should have benefitted Mutual Minds.  Specifically, defendants used Mutual Minds' Trade Secrets and improperly accessed one or more of the Websites by creating fake user

accounts to establish competing Websites. This included targeting the very demographics Mutual Minds targets, communicating with members the same way as Mutual Minds, and copying in a wholesale fashion the source code of the Websites and the timing, type, and placement of content. As one example only, defendants created a website for single parents (http://www.parentsforcheaperliving.com) to rip off the Mutual Minds website for single parents (http://www.spaoa.org) and included similar ads (ads for cars for example) because defendants knew, resulting only from their relationship with Mutual Minds, that the combination of the Websites' unique characteristics and types of ads placed on those sites would yield high conversion rates that Mutual Minds would otherwise realize.

27.     Around the time defendants established their competing websites (and before Mutual Minds discovered defendants' illicit conduct), defendants attempted to force Mutual Minds to agree to unconscionable terms and conditions. iDrive required that Mutual Minds consent to these terms by refusing access to iDrive's online portal, which Mutual Minds needed to access to see how much iDrive owed Mutual Minds for conversions, unless Mutual Minds agreed to the terms. Under duress, Mutual Minds consented to the terms.

28.     In these unconscionable and unenforceable terms, defendants intended, among other things, to force Mutual Minds to convert and convey trade secrets and confidential information relating to Mutual Minds' members and other things to

defendants' own possession.  These terms and conditions are unenforceable because defendants purported to commit Mutual Minds to them by fraudulently omitting that Mutual Minds would use the terms in an attempt to obtain ownership and control over Mutual Minds conversion rates and other things, and then build one or more competing websites and businesses such as PCL.

29.   Mutual Minds discovered defendants' misconduct as alleged herein when a colleague of a Mutual Minds employee notified Mutual Minds of the suspicious similarity between the Mutual Minds website http://spaoa.org and the iDrive website http://parentsforcheaperliving.com.   When confronted with this evidence, Tron Shelly, a co-founder and Executive Vice President of iDrive, admitted that iDrive had always wanted to own their own site, that iDrive had copied Mutual Minds' website, and brazenly, that there was nothing that Mutual Minds could do about it.  Shelly did so during a call with James Maynard of Mutual Minds on or after June 20, 2014, when Mutual Minds received an unsolicited notification stating in relevant part: "iDrive cop[y]ing your SPAOA.org? parentsforheaperliving."

30.   More recently, Mutual Minds updated all of its email templates used to market to their existing members and discovered that, within 2 days, iDrive had copied their templates.  iDrive also began to use the same email service provider as Mutual Minds to deliver email.

31.    Defendants' wholesale copying of Mutual Minds business, methods, and Websites, which iDrive was only able to accomplish due to its illicit use of Mutual Minds' Trade Secrets, caused substantial amounts of affiliate network confusion in the industry.  Indeed, networks contacted Mutual Minds about defendants' websites and traffic thinking that they belonged to Mutual Minds. Defendants may very well have received similar communications regarding Mutual Minds' Websites.

32.    This network confusion poses a substantial and continuing risk to Mutual Minds' business because the quality of the traffic driven to the Websites is first-rate in the industry.  If networks or advertisers believe that Mutual Minds is responsible for the lower quality traffic driven to defendants' websites, advertisers may be deterred from or cease working with Mutual Minds.  This network confusion also allows defendants to take advantage of the goodwill Mutual Minds established for itself in the industry through the expenditure of significant time, resources, and effort.

33.    Defendants' wholesale copying of Mutual Minds' email campaigns has caused similar confusion and harm to Mutual Minds.

34.    Mutual Minds would not have entered into a business relationship with iDrive (and by extension the individual defendants), continued with any relationship, allowed access to the Websites or its Trade Secrets, or purportedly agreed to any

14

terms or conditions, if it had known that defendants were going to use the information obtained from the relationship to compete with Mutual Minds.

35.     Rather than correcting their misconduct or compensating Mutual Minds for the business defendants stole from Mutual Minds, defendants claim that they commissioned an investigation – the results of which they refused to reveal – that supposedly showed that Mutual Minds copied content on one or more of the Websites.  This investigation, even if the results exist, was commissioned solely to deflect liability, and to intimidate Mutual Minds from filing suit.  Mutual Minds is not intimidated by iDrive's unconscionable misconduct or any alleged investigation, and pursues the following claims for relief.

36.     All conditions precedent to the maintenance of this action have been fulfilled.

## COUNT I
## MISAPPROPRIATION OF TRADE SECRETS
(Pennsylvania Uniform Trade Secrets Act, 12 P.S. § 5301, *et seq*.)
(As to All Defendants)

37.     Mutual Minds re-pleads, re-alleges, and incorporates into this count each and every allegation set forth in this Complaint.

38.     Mutual Minds' Trade Secrets constitutes trade secret information as the term is defined in the Pennsylvania Uniform Trade Secrets Act.  This is because the Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable by, proper means by other persons who can

obtain economic value from its disclosure or use, and the Trade Secrets are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

39.    The Trade Secrets were developed through Mutual Minds' expenditure of significant time, effort, money, and resources, and have substantial economic value in that the use of the information has enabled Mutual Minds to build a successful business and identify and fill the needs of their members better than their competitors.  Indeed, disclosure of conversion rates and the other Trade Secrets, combined with the unique characteristics of the Websites, would allow competing marketers to copy the Websites and then dilute the revenues generated from them. Thus, conversion rates and the other Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable by, proper means by other persons who can obtain economic value from its disclosure or use.

40.    The Trade Secrets are not publicly available and were a competitor to gain unauthorized access to them, they would provide a significant and unfair competitive advantage to the competitor to the detriment of Mutual Minds.  Indeed, that is exactly what happened when defendants misappropriated the Trade Secrets: they formed competing websites to divert profits to themselves instead of Mutual Minds.  Although Mutual Minds allowed iDrive to access the Trade Secrets solely

to benefit Mutual Minds (and iDrive but only to the extent that Mutual Minds also benefitted), Mutual Minds took measures to protect the Trade Secrets, including storing the information on secure, password protected servers, implementing policies preventing unauthorized disclosure to third parties, and restricting access to the Trade Secrets to only those with a need to know.

41.    In around the Summer of 2014, defendants intentionally misappropriated Mutual Minds' trade secrets by using Mutual Minds' trade secrets without the express or implied consent of Mutual Minds to establish websites and at least one business that compete with the Websites.  This use of the Trade Secrets alleged in this complaint exceeded the scope of allowed by Mutual Minds.

42.    At the time of defendants' use of the Trade Secrets, each defendant knew or had reason to know that their knowledge of the trade secrets was either acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to Mutual Minds to maintain its secrecy or limit its use.  Defendants knew that the Trade Secrets were secret and derived value from their secrecy because iDrive itself undertook measures to prevent Mutual Minds from accessing similar information, among other ways, by blocking Mutual Minds from accessing iDrive's competing sites beyond the initial pages.

43.     As a result of defendants' conduct, Mutual Minds has suffered monetary damages in an amount to be proven at trial, including but not limited to lost revenues that defendants obtained.   Given that Mutual Minds' websites generated hundreds of thousands of dollars in revenue for iDrive, Mutual Minds believes that the websites defendants created using the Trade Secrets also generated a similar amount but certainly more than $75,000.

44.     Defendants' conduct in misappropriating and using Mutual Minds' trade secrets was willful and malicious, and therefore, Mutual Minds is entitled to double damages as well as its attorney's fees and costs pursuant to 12 P.S. §§ 5304-5305.  The damages include, but are not limited to, the any revenues and profits that defendants generated by reason of their misappropriation of trade secrets as alleged herein.  Given that Mutual Minds' websites generated hundreds of thousands of dollars in revenue for iDrive, Mutual Minds believes that the websites defendants created using the Trade Secrets also generated a similar amount but certainly more than $75,000.

45.     Mutual Minds is also entitled to injunctive relief enjoining defendants from possessing or using Mutual Minds' Trade Secrets for any purpose, or from operating any website that includes or was created using the Trade Secrets.

## COUNT II
## BREACH OF CONTRACT – COVENANT OF GOOD FAITH AND FAIR DEALING
### (As to Defendant iDrive)

46.     Mutual Minds re-pleads, re-alleges, and incorporates into this count each and every allegation set forth in this Complaint.

47.     As set forth above, iDrive alleges that Mutual Minds and iDrive entered into a contract in or around 2011, whereby Mutual Minds agreed to post ads provided by iDrive on Mutual Minds' Websites.  In exchange, iDrive would remit to Mutual Minds a portion of the revenue generated for iDrive's advertiser-clients as a result of web users clicking on ads, completing a purchase, or some other conversion or action.  iDrive further claimed in its pending motion to dismiss that Mutual Minds agreed to revised terms.  Mutual Minds assumes, for purposes of this count, that at least one contract existed at all relevant times.

48.     Under Pennsylvania law, every contract contains within it a covenant of good faith and fair dealing, regardless of whether such an obligation is explicitly stated.

49.     Here, iDrive breached the covenant of good faith and fair dealing by using its contractual relationship with Mutual Minds to create competing websites and at least one competing business to divert business away from Mutual Minds. Solely to facilitate iDrive's performance of its contractual obligations, defendants were entrusted with, were granted access to, and gained knowledge of Mutual Minds'

Trade Secrets.   But rather than using Mutual Minds' Trade Secrets and other information learned during their alleged contractual relationship to further the interests of the partnership between Mutual Minds and iDrive, iDrive improperly used the Trade Secrets to create competing websites to market share away from Mutual Minds, including at least Parents for Cheaper Living.

50.   As a result of iDrive's breach of the covenant of good faith and fair dealing, Mutual Minds did not realize the benefit of the bargains of the contracts that iDrive claims governed the parties' relationship because iDrive diverted revenues away from Mutual Minds and to itself, its related company Parents for Cheaper Living, and the individual defendants.  But for iDrive's breach, Mutual Minds would have generated revenues by receiving web traffic to its sites and the parties would have mutually benefitted economically under the contracts.  Mutual Minds believes that it would have received at least $75,000 in revenues if iDrive had not breached the covenant of good faith and fair dealing based on the fact that iDrive generated hundreds of thousands of dollars resulting from placing ads on Mutual Minds websites such as Single Parents Alliance of America or spaoa.org.

## COUNT III
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (As to Defendants Shelly, Miller, and Parents for Cheaper Living)

51.   Mutual Minds re-pleads, re-alleges, and incorporates into this count each and every allegation set forth in this Complaint.

20

52.     As set forth above, iDrive alleges that Mutual Minds and iDrive entered into a contract in or around 2011, whereby Mutual Minds agreed to post ads provided by iDrive on Mutual Minds' Websites.  When a user clicks on an ad and completes a purchase or other conversion, iDrive would remit to Mutual Minds a portion of the revenue generated for iDrive's advertiser-clients as a result of that user action. iDrive further claimed in its pending motion to dismiss that Mutual Minds agreed to revised terms.  Mutual Minds assumes, for purposes of this count, that at least one contract existed at all relevant times.

53.     Without privilege or justification, Shelly, Miller, and PCL intended to, and did, harm Mutual Minds by interfering with and causing a breach of the very contractual relationship iDrive claims existed between Mutual Minds and iDrive. PCL, Shelly, and Miller interfered by inducing iDrive, using Shelly and Miller's positions as principals of iDrive, to breach the covenant of good faith and fair dealing in iDrive's contract (or contracts) with Mutual Minds, as described more particularly above.  PCL, Shelly, and Miller knew about the alleged contracts because Shelly and Miller are iDrive officers or executives (or both), and thus necessarily knew about the contracts that iDrive claims governed the parties' relationship.

54.     On information and belief, PCL was formed by Shelly and Miller for the purpose of interfering with the contract between iDrive and Mutual Minds, or at the very least, PCL was directed by Shelly and Miller to interfere with the contract

between Mutual Minds and iDrive, of which Shelly and Miller are principals.  As a result of the above-described interference, PCL, Shelly, and Miller gained access to Mutual Minds' Trade Secrets for the purposes of setting up a competing website owned and operated by PCL, thereby breaching the contracts (specifically the covenant of good faith and fair dealing in the contracts).

55.    Given that Mutual Minds' websites generated hundreds of thousands of dollars in revenue for iDrive, Mutual Minds believes that the websites defendants created using the Trade Secrets also generated a similar amount but certainly more than $75,000.  Thus, as a result of the conduct of Shelly, Miller, and PCL, Mutual Minds was damaged in an amount in excess of $75,000 to be proven at trial.

## COUNT IV
## FRAUDULENT NONDISCLOSURE
(As to All Defendants Except PCL)

56.    Mutual Minds re-pleads, re-alleges, and incorporates into this count each and every allegation set forth in this Complaint.

57.    During Mutual Minds and iDrive's business relationship, including in or around the summer of 2014, defendants (except PCL) failed to disclose to Mutual Minds that defendants intend to steal Mutual Minds Trade Secrets, including the conversion rates associated with the Websites and other Trade Secrets, in order to start websites that competed with the Websites.

58.    Defendants (except possibly PCL) knew that had they disclosed that they intended to use and did use Mutual Minds conversion rates and other facts and Trade Secrets to Mutual Minds that Mutual Minds would not have entered into any business relationship with the non-PCL defendants and would not have continued its business relationship with the non-PCL defendants.

59.    At all relevant times, the non-PCL defendants owed Mutual Minds a duty to exercise reasonable care to disclose their intent to misappropriate Mutual Minds' trade secrets for use beyond the scope of the relationship between them and Mutual Minds.  This is because this fact is basic to the any agreement or arrangement between the non-PCL defendants and Mutual Minds, the non-PCL defendants knew that Mutual Minds was under the impression that the non-PCL defendants would not use Mutual Minds' Trade Secrets to compete with Mutual Minds or for any purpose unrelated to their relationship, and Mutual Minds would reasonably expect for such competitive intent to be disclosed before entering into any collaborative agreement.

60.    Due to its reasonable and justified belief that the non-PCL would not steal or misuse its trade secrets or start competing websites, Mutual Minds entered into, and continued, the business relationship with the non-PCL defendants.  As a result, Mutual Minds was damaged in an amount to be proven at trial.

61.    Mutual Minds is also entitled to punitive damages in light of defendants' outrageous conduct.

62.     Mutual Minds suffered damages in an amount exceeding $75,000, including the revenues that the defendants received resulting from their fraud.  Given that Mutual Minds' websites generated hundreds of thousands of dollars in revenue for iDrive, Mutual Minds believes that the websites defendants created using the Trade Secrets also generated a similar amount but certainly more than $75,000.

## COUNT V
## FRAUDULENT INDUCEMENT
(As to All Defendants)

63.     Mutual Minds re-pleads, re-alleges, and incorporates into this count each and every allegation set forth in this Complaint.

64.     Shortly after or around the time defendants established their competing websites (and before Mutual Minds discovered defendants' illicit conduct), the non-PCL defendants represented to Mutual Minds that it would no longer be able to access an online portal controlled by iDrive (and likely Miller and Shelly) that Mutual Minds needed to access to determine how much it was to be paid for conversions generated for iDrive's clients unless Mutual Minds agreed to revised and unconscionable terms and conditions that heavily favored iDrive.

65.     In fact, this representation was false, and iDrive (including through Miller and Shelly) could have made its online portal available to Mutual Minds without forcing Mutual Minds to sign revised terms and conditions.

66.    On information and belief, the non-PCL defendants knew this representation was false when they made the representation, and these defendants made the representation with the intent of inducing Mutual Minds to agree to the revised and unconscionable terms, which among other things, purported to assign Mutual Minds' Trade Secrets to iDrive.

67.    Mutual Minds' justifiably relied on the non-PCL defendants' representation, and as a result, was damaged in an amount in excess of $75,000 to be proven at trial.   Given that Mutual Minds' websites generated hundreds of thousands of dollars in revenue for iDrive, Mutual Minds believes that the websites defendants created using the Trade Secrets also generated a similar amount but certainly more than $75,000.

## **PRAYER FOR RELIEF**

WHEREFORE, Mutual Minds demands that judgment be entered in its favor and against defendants as follows:

1.    That Mutual Minds be awarded damages in an amount exceeding $75,000 to be proven at trial;

2.    That iDrive be ordered to deliver all data it obtained resulting from its actions described in this complaint;

3.     That iDrive be restrained from operating all competing sites, including parentsforcheaperliving.com, and that all ownership and control of the competing sites be transferred to Mutual Minds;

4.     That Mutual Minds be awarded punitive damages for defendants' willful and malicious conduct;

5.     That Mutual Minds be awarded its attorneys' fees pursuant to statute, including 12 P.S. § 5305;

6.     That Mutual Minds be awarded injunctive relief prohibiting defendants from possessing or using Mutual Minds' Trade Secrets for any purpose;

7.     That Mutual Minds be awarded pre-judgment and post-judgment interest at the statutory rate;

8.     That Mutual Minds be awarded its costs of suit; and

9.     That Mutual Minds be awarded such further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Mutual Minds demands trial by jury of all issues triable of right by a jury.

Respectfully submitted,

VENABLE LLP


By:    /s/ Ari N. Rothman
       Ari N. Rothman
       Shahin Rothermel
       VENABLE LLP
       575 7th Street, NW
       Washington, DC  20004
       (202) 344-4000

       Timothy J. Nieman
       RHOADS & SINON LLP
       One South Market Square
       P. O. Box 1146
       Harrisburg, PA 17108-1146
       (717) 233-5731


       Attorneys for Plaintiff
       MUTUAL MINDS, LLC

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MUTUAL MINDS, LLC, a California limited liability company,<br><br>        Plaintiff,<br><br>        vs.<br><br>TRON SHELLY, an individual; RICK MILLER, an individual; iDRIVE INTERACTIVE, LLC, a Pennsylvania limited liability company; PARENTS FOR CHEAPER LIVING, LLC, a Virginia limited liability company; and DOES 1 through 10, inclusive,<br><br>        Defendants. | CASE NO. 16-cv-00541-JEJ |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she has electronically filed a true and correct document entitled *Plaintiff Mutual Minds, LLC's First Amended Complaint*, which is available for viewing and downloading from the United States District Court for the Middle District of Pennsylvania Electronic Case Filing System (ECF), on June 22, 2016.


VENABLE LLP


By:   /s/ Shahin Rothermel
      Shahin Rothermel

      Attorney for Plaintiff
      MUTUAL MINDS, LLC