## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

MUTUAL MINDS, LLC, a California
limited liability company,

       Plaintiff,

    v.

TRON SHELLY, an individual; RICK
MILLER, an individual; iDRIVE
INTERACTIVE, LLC, a Pennsylvania
limited liability company; PARENTS
FOR CHEAPER LIVING, LLC, a
Virginia limited liability company; and
DOES 1 through 10, inclusive,

       Defendants.

Case No. 1:16-cv-00541-JEJ

The Hon. John E. Jones III

## BRIEF OF DEFENDANTS TRON SHELLY, RICK MILLER, iDRIVE INTERACTIVE, LLC, AND PARENTS FOR CHEAPER LIVING, LLC IN SUPPORT OF MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................... ii

CERTIFICATE OF COMPLIANCE WITH L.R. 7.8(B)(2) ....................................iv

INTRODUCTION .................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ............................................2

ARGUMENT ......................................................................................4

    A. The FAC, and each claim therein, must be dismissed for failure to state a valid claim for relief ..................................................................4

        1. The Court must accept all allegations in the FAC as true *except* for conclusory allegations contradicted by documentary evidence incorporated within the pleading.......................................................4

        2. Mutual Mind's refusal to attach the Contract to the FAC is intentionally misleading and does not rescue its claims .................6

        3. Mutual Minds has failed to plead that the Contract is unconscionable ...............................................................7

        4. Mutual Minds fails to state a cause of action for misappropriation of trade secrets.....................................................................9

        5. Mutual Minds fails to state a cause of action for breach of the covenant of good faith and fair dealing .........................................10

        6. Mutual Minds fails to state a cause of action for tortious interference with contractual relations............................................11

        7. Mutual Minds fails to state a cause of action for fraudulent non-disclosure......................................................................13

        8. Mutual Minds fails to state a cause of action for fraudulent inducement ...........................................................................14

    B. Mutual Minds' claims against the Individual Defendants fail across the board .......................................................................16

CONCLUSION ...................................................................................17

i

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ...................................4, 5

*Asirobicon, Inc. v. Rolls-Royce PLC*,
   No. CIV.A. 03-273, 2003 WL 22071002 (W.D. Pa. Sept. 5, 2003) ....................9

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................4

*Bral Corp. v. Johnstown Am. Corp.*,
   919 F. Supp. 2d 599 (W.D. Pa. 2013) .............................................................12

*Corr. U.S.A. v. McNany*,
   892 F. Supp. 2d 626 (M.D. Pa. 2012) .............................................................12

*Dollar Tree Stores Inc. v. Toyama Partners, LLC*, No. C
   10-325 SI, 2010 WL 4973761 (N.D. Cal. Dec. 1, 2010) ....................................5

*Fowler v. UPMC Shadyside*,
   578 F.3d 203 (3d Cir. 2009) ...............................................................................5

*Galicki v. New Jersey*,
   No. CIV.A. 14-169 JLL, 2015 WL 3970297 (D.N.J. June 29, 2015)................16

*Germantown Mfg. Co. v. Rawlinson*,
   341 Pa. Super. 42, 491 A.2d 138 (1985) ............................................................8

*Gnagey Gas & Oil Co. v. Pennsylvania Underground Storage Tank
   Indemnification Fund*,
   82 A.3d 485 (Pa. Commw. Ct. 2013) ...............................................................13

*Hanaway v. Parkesburg Grp., LP*,
   2015 PA Super 263, 132 A.3d 461 (2015) .......................................................11

*Harris v. Green Tree Fin. Corp.*,
   183 F.3d 173 (3d Cir.1999) ................................................................................8

*In re Balko*,
   348 B.R. 684 (W.D. Pa. 2006) .........................................................................16

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir.1997) ............................................................................13

*In re Elkins-Dell Mfg. Co.*,
   253 F. Supp. 864 (E.D. Pa. 1966).......................................................................8

*In re Suprema Specialties, Inc. Sec. Litig.*,
   438 F.3d 256 (3d Cir. 2006) .............................................................................14

*MB Imports, Inc. v. T & M Imports, LLC*,
   No. CIV. 10-3445 ES, 2012 WL 5986454 (D.N.J. Nov. 28, 2012).....................5

*McAllister v. Royal Caribbean Cruises, Ltd.*,
   No. CIV.A. 02-CV-2393, 2003 WL 23192102 (E.D. Pa. Sept. 30, 2003) .........15
*New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New
   Jersey*,
   760 F.3d 297 (3d Cir. 2014) ...................................................................................4
*O'Shea v. Direct Fin. Solutions, LLC*,
   Civ. A. No. 07-1881, 2007 WL 4373038 (E.D. Pa. Dec. 5, 2007) ......................8
*Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*,
   998 F.2d 1192 (3d Cir. 1993) ...............................................................................6
*Postie v. Frederick*,
   No. 3:14-CV-00317, 2015 WL 7428616 (M.D. Pa. Nov. 23, 2015) ...................5
*Riordan v. H.J. Heinz Co.*,
   No. CIV.A. 08-1122, 2009 WL 2485958 (W.D. Pa. Aug. 12, 2009) ................10
*Sheeran v. Blyth Shipholding S.A.*,
   No. CV 14-5482 (JBS/AMD), 2015 WL 9048979 (D.N.J. Dec. 16, 2015).......16
*Three D Departments, Inc. v. K Mart Corp.*,
   940 F.2d 666 (7th Cir. 1991) ................................................................................8
*Vasilis v. Bell of Pennsylvania*,
   409 Pa. Super. 396, 598 A.2d 52 (1991) ..............................................................8
*Youndt v. First Nat. Bank of Port Allegany*,
   2005 Pa. Super. 42, 868 A.2d 539 (2005) ..........................................................13

**Rules**
Fed. R. Civ. P. 8(a)...................................................................................................4
Fed. R. Civ. P. 9(b) ..........................................................................................13, 15
Fed. R. Civ. P. 11 ...................................................................................................iv
Fed. R. Civ. P. 12(b)(6)............................................................................................4

**Other Authorities**
L.R. 7...................................................................................................................i, iv
Uniform Trade Secrets Act, 122 P.S. §§5301 *et seq.* .........................................9, 10

## CERTIFICATE OF COMPLIANCE WITH L.R. 7.8(b)(2)

I, Karl S. Kronenberger, counsel of record for Defendants, hereby certify, subject to Fed. R. Civ. P. 11, that this Brief contains 4,689 words, as calculated by the Word Count feature of the Microsoft Word word-processing program used to prepare the Brief.


By:  s/ Karl S. Kronenberger

        Karl S. Kronenberger

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## I.   INTRODUCTION

As with the original Complaint filed in this action, the First Amended Complaint (the "FAC") makes clear that the facts at hand boil down to this: Plaintiff Mutual Minds, LLC ("Mutual Minds") has a parenting blog and is mad that iDrive Interactive, LLC and Parents for a Cheaper Living, LLC (the "Corporate Defendants")—who had previously placed advertisements on Mutual Minds' blog—started one, too.

Of course, operating a competing parenting blog is not an actionable offense, and Mutual Minds concedes as much in the FAC. As such, Mutual Minds creatively pleads that, because the Corporate Defendants discovered that parenting blogs are a good source of Internet traffic by advertising on Mutual Minds' blog, the Corporate Defendants' own blog is necessarily a misappropriation of Mutual Minds' trade secrets. Unfortunately for Mutual Minds, this argument is readily defeated by (1) the fact that Mutual Minds admits disclosing the alleged trade secrets without any confidentiality agreement in place and (2) the written contract between Mutual Minds and Corporate Defendant iDrive (the "Contract"), which expressly states that all statistical data generated through their advertising relationship is the property and trade secret of iDrive. Well aware of the fact that the Contract defeats its claims, Mutual Minds has refused to attach it to the FAC,

intentionally misled the Court as to its terms, and alleged that the Contract is unconscionable despite being a business-to-business agreement. Mutual Minds' allegations against Tron Shelly and Rick Miller (the "Individual Defendants") are even more nebulous and fail to establish the requisite notice or plausibility. Even when these ridiculous allegations are assumed true, it is clear from the face of the FAC that Mutual Minds has not, and cannot, state a valid claim for relief against Defendants. Accordingly, the FAC must be dismissed in its entirety.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Corporate Defendant iDrive is an Internet Advertising company formerly known as 4 Play Media, LLC. "Publishers"—that is, the owners of websites and blogs—enroll with iDrive to run iDrive advertisements on their blogs in exchange for compensation. (FAC ¶18.)

Plaintiff Mutual Minds enrolled as a Publisher of iDrive in 2011. (*Id.*) Like all Publishers, Mutual Minds accepted and agreed to iDrive's Publisher agreement, and Mutual Minds admitted to doing as much in the original Complaint. (Original Complaint ["OC"] ¶25.) While Mutual Minds now contends that "a factual dispute exists as to whether this agreement between Mutual Minds and iDrive existed, and if so when and on what terms" (FAC ¶19), it is clear from the face of the FAC that Mutual Minds' second, third, and fifth causes of action are expressly based on iDrive's Publisher agreement. (FAC ¶¶47, 53, 64.) A true and correct copy of

2

iDrive's 2010 Publisher agreement, which Mutual Minds accepted and agreed to in 2011, is attached hereto as Exhibit A. In 2014, iDrive revised its Publisher agreement to address newly-enacted Canadian legislation regarding email advertising, and all Publishers—including Mutual Minds—agreed to the updated terms. (OC ¶25 [admitting agreement to "revised" terms].) A true and correct copy of iDrive's 2014 Publisher agreement is attached hereto as Exhibit B. Because the relevant portions of the 2010 and 2014 agreements are identical, they are collectively referred to herein as "the Contract."

Section 8.1 of the Contract makes it clear that iDrive (as "Company") is the exclusive owner of all consumer data and metrics generated as a result of the advertising arrangement with the Publisher ("You"):

> 8.1 All information submitted by end-user customers pursuant to a Program is proprietary to and owned by Company or its affiliates. Such customer information is confidential and may not be disclosed by You. In addition, You acknowledge that all non-public information, data and reports received from Company hereunder or as part of the services hereunder is proprietary to and owned by Company ("Confidential Information").

(Exs. A–B.) Section 8.2 includes a unilateral NDA in favor of iDrive and offering no protections or expectation of confidentiality to Mutual Minds. (*Id.*) As such, iDrive—and not Mutual Minds—owns all data received as a result of the business relationship between iDrive and Mutual Minds. To the extent Mutual Minds disclosed any information to the Corporate Defendants or Individual Defendants

3

(collectively "Defendants") outside of the Contract, it waived any trade secret protection by doing so.

## III.   ARGUMENT

### A. The FAC, and each claim therein, must be dismissed for failure to state a valid claim for relief.

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. Although the pleading requirements are liberal, Fed. R. Civ. P. 8(a), a claimant must still allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). As outlined below, Mutual Minds has failed to meet the plausibility threshold with any of its claims.

### 1.   The Court must accept all allegations in the FAC as true *except* for conclusory allegations contradicted by documentary evidence incorporated within the pleading.

In ruling on a motion to dismiss, the court must assume that Mutual Minds' allegations are true and must draw all reasonable inferences in Mutual Minds' favor. *See, e.g.*, *New Jersey Carpenters & the Trustees Thereof v. Tishman Const.*

*Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014). The Court must then determine whether the complaint alleges a plausible claim to relief. *See Iqbal*, 129 S.Ct. at 1950. In determining whether the alleged facts cross the threshold from the possible to the plausible, the Court is required "to draw on its judicial experience and common sense." *Id.* "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.*

Although the Court must assume the truth of the allegations in the FAC, "[a]fter *Iqbal*, it is clear that conclusory or 'bare bones' allegations will no longer survive a motion to dismiss," including threadbare recitals of the elements of a cause of action. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). This is especially applicable to conclusory allegations which are contradicted by documents referred to in the FAC. *See, e.g.*, *Postie v. Frederick*, No. 3:14-CV-00317, 2015 WL 7428616, at *1 (M.D. Pa. Nov. 23, 2015); *MB Imports, Inc. v. T & M Imports, LLC*, No. CIV. 10-3445 ES, 2012 WL 5986454, at *5 (D.N.J. Nov. 28, 2012). Where a claimant references a contract in a complaint, the terms of the contract supersede the conclusory allegations. *Dollar Tree Stores Inc. v. Toyama Partners, LLC*, No. C 10-325 SI, 2010 WL 4973761 (N.D. Cal. Dec. 1, 2010).

//

//

5

## 2. __Mutual Mind's refusal to attach the Contract to the FAC is intentionally misleading and does not rescue its claims.__

In order to prevent a plaintiff from surviving a motion to dismiss by deliberately omitting documents, a court may consider a writing referenced in a complaint but not explicitly incorporated therein if the complaint relies on the document. *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Here, the FAC expressly references the Contract, and the second, third, and fifth claims for relief are based upon it. For example:

- In Paragraph 18, Mutual Minds admits that "From approximately 2011 to 2014, Mutual Minds partnered with iDrive, an advertising network, to post ads on several online communities Mutual Minds created for demographics such as single parents…." Despite Mutual Minds' use of *partnered*, it is clear Mutual Minds and iDrive entered into an advertising agreement.

- Mutual Minds admits in Paragraph 27 that "Around the time defendants established their competing websites (and before Mutual Minds discovered defendants' illicit conduct), defendants attempted to force Mutual Minds to agree to [revised and unconscionable] terms and conditions." The phrase "revised and unconscionable" was used by Mutual Minds in the Complaint but removed in the FAC. (OC ¶25.) Regardless, these "terms" are the Contract.

6

- Mutual Minds' second claim is based on the Contract. In Paragraph 47 of that claim, Mutual Minds—using as convoluted verbiage as possible—alleges that "iDrive alleges that Mutual Minds and iDrive entered into a contract in or around 2011" and that "Mutual Minds assumes, for purposes of this count, that at least one contract existed at all relevant times."

- Mutual Minds' third claim alleges that the Contract existed and that the non-iDrive Defendants induced iDrive's breach of it. In Paragraph 53—once again speaking in circles by basing its own allegations on iDrive's allegations—Mutual Minds alleges that these Defendants "harm[ed] Mutual Minds by interfering with and causing a breach of the very contractual relationship iDrive claims existed between Mutual Minds and iDrive."

- Mutual Minds' fifth claim alleges that Defendants fraudulently induced Mutual Minds' entry into the Contract. (FAC ¶¶64–66.)

For all of these reasons, the Contract is part and parcel of the FAC, despite Mutual Minds' self-contradictory statements that its existence is in dispute. Accordingly, the Court's consideration of the Contract is both proper and required.

### 3. **Mutual Minds has failed to plead that the Contract is unconscionable.**

"Unconscionability is a 'defensive contractual remedy which serves to relieve a party from an unfair contract or from an unfair portion of a contract.'"

*Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 181 (3d Cir.1999) (quoting *Germantown Mfg. Co. v. Rawlinson*, 341 Pa. Super. 42, 491 A.2d 138, 145 (1985)). Under Pennsylvania law, "[a] party challenging a contract provision as unconscionable generally bears the burden of proving that the provision is procedurally and substantively unconscionable." *O'Shea v. Direct Fin. Solutions, LLC*, Civ. A. No. 07-1881, 2007 WL 4373038, at *2 (E.D. Pa. Dec. 5, 2007).

Importantly, while the doctrine of unconscionability is necessary to invalidate unlawful provisions in consumer contracts, the courts of Pennsylvania and other jurisdictions rarely apply it to business-to-business contracts between "knowledgeable contracting parties." *In re Elkins-Dell Mfg. Co.*, 253 F. Supp. 864, 871–72 (E.D. Pa. 1966); *see also Vasilis v. Bell of Pennsylvania*, 409 Pa. Super. 396, 400, 598 A.2d 52, 54 (1991) (Contracts between merchants are rarely unconscionable because "there is no disparity between such entities in either bargaining power or sophistication."); *Three D Departments, Inc. v. K Mart Corp.*, 940 F.2d 666 (7th Cir. 1991) (Substantive unconscionability "will rarely be found" in business contracts "because in the commercial setting the relationship is between business parties and is not so one-sided as to give one party the bargaining power to impose unconscionable terms on the other party."). As in those cases, here the Contract was between two business entities. Mutual Minds—who willfully enrolled as a publisher of iDrive—had every opportunity to seek ads placed by

other advertisers if it was unhappy with the terms of the Contract. Accordingly, it is clear from the face of the FAC that the Contract is valid and enforceable.

### 4. **Mutual Minds fails to state a cause of action for misappropriation of trade secrets.**

Mutual Minds' first claim is for misappropriation of trade secrets in violation of the Pennsylvania Uniform Trade Secrets Act, 122 P.S. §§5301 *et seq.* (the "PUTSA"). The prima facie elements of this claim are: (1) the existence of trade secrets; (2) communication of the trade secrets pursuant to a confidential relationship; (3) use of the trade secrets in violation of that confidence; and (4) harm to the plaintiff. *See e.g.*, *Asirobicon, Inc. v. Rolls-Royce PLC*, No. CIV.A. 03-273, 2003 WL 22071002, at *7 (W.D. Pa. Sept. 5, 2003).

Mutual Minds defines its trade secrets as "a detailed description of Mutual Minds' target demographics, information regarding Mutual Minds members, such as members' unique IP addresses and detailed information regarding member preferences and the types of advertisements most likely to lead to sales as reflected in conversion rates, earnings-per-click data, complete questionnaire information for each member that converted into a sale, and back-end enrollment statistics." (FAC ¶20.) However, Section 8.1 of the Contract says that this very same information—i.e., "[a]ll information submitted by end-user customers" is "proprietary to and owned by" iDrive and its affiliates. (Ex. A, ¶8.1; Ex. B, ¶8.1.)

9

Accordingly, Mutual Minds has no rights to its alleged trade secrets, and the Corporate Defendants—as the true owners of such information—could not have misappropriated the same.

The PUTSA claim also fails because Mutual Minds admits it disclosed its alleged trade secrets to Defendants without any confidentiality agreement in place. Section 8.2 of the Contract provides unilateral confidentiality protection to iDrive only. (Ex. A, ¶8.2; Ex. B, ¶8.2.) Mutual Minds has not alleged the existence of any other confidentiality agreement or confidential relationship between the parties that would suffice to protect its trade secrets. Thus, whether or not the Contract applies, Mutual Minds has waived any trade secret protection by disclosing the information at issue to Defendants. *See, e.g.*, *Riordan v. H.J. Heinz Co.*, No. CIV.A. 08-1122, 2009 WL 2485958, at *8 (W.D. Pa. Aug. 12, 2009) ("Because Plaintiff has lifted the veil of secrecy from his ideas by disclosing them to Defendant, amendment of his complaint as to any misappropriation of trade secrets claim is futile because amendment would not cure this deficiency.") For these reasons, the PUTSA claim fails and must be dismissed.

### 5. <u>Mutual Minds fails to state a cause of action for breach of the covenant of good faith and fair dealing.</u>

Under Pennsylvania law:

[A] breach of the covenant of good faith and fair dealing is a breach of contract action, not an independent action for breach of a duty of good

10

faith. The implied covenant of good faith and fair dealing attaches to existing contractual obligations; it does not add new contractual duties. In essence, the duty to act in good faith and deal[ing] fairly infuses the parties' performance of their express contractual obligations.

*Hanaway v. Parkesburg Grp., LP*, 2015 PA Super 263, 132 A.3d 461, 471–72 (2015) (internal citations omitted). Yet here, Mutual Minds attempts to bring this claim without an underlying breach of contract claim and has beat around the bush as to the existence and terms of the Contract. Instead, Mutual Minds attempts to employ this claim to imbue Defendants with duties that they do <u>not</u> have under the Contract—a practice expressly disavowed by *Hanaway*. Because Mutual Minds has failed to allege the existence of the contract underlying this claim and its essential terms, Mutual Minds has failed to state a cognizable claim for breach of the covenant of good faith and fair dealing and its second cause of action must be dismissed.

## 6. <u>Mutual Minds fails to state a cause of action for tortious interference with contractual relations.</u>

As its third claim, Mutual Minds alleges that the non-iDrive Defendants caused "a breach of the very contractual relationship iDrive claims existed between Mutual Minds and iDrive." (FAC ¶53.) Mutual Minds has failed to plead each of the prima facie elements of this claim, which are: "(1) the existence of a contractual, or prospective contractual relation between the complainant and a third

11

party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct." *Bral Corp. v. Johnstown Am. Corp.*, 919 F. Supp. 2d 599, 612 (W.D. Pa. 2013).

As to the first element, once again, Mutual Minds' noncommittal approach to the Contract defeats its own claims. As to the second element, Pennsylvania law is clear that (1) a company cannot be held to tortiously interfere with its own contracts, and (2) the company's employees and officers are considered one and the same with the company and can therefore not be held to tortiously interfere with company's contracts when acting within the scope of their employment. *Corr. U.S.A. v. McNany*, 892 F. Supp. 2d 626, 637 (M.D. Pa. 2012). Here, Mutual Minds alleges the inducement of breach was accomplished *within* the scope of the Individual Defendants' employment at iDrive. (FAC ¶53 ["…using Shelly and Miller's positions as principals of iDrive…"].) As to the third element, the privilege or justification is found within Section 8.1 of the Contract itself. Finally, as to the fourth element, Mutual Minds continues to fail to allege the existence of actual damages with any specificity.[1]

---

[1] As to damages, Defendants still contend, as discussed at the June 29, 2016 case management conference with the Court, that Plaintiff does not have a good faith basis to allege that it has suffered the jurisdictional minimum of $75,000 in damages.

For all of these reasons, it is clear from the face of the FAC that Mutual Minds does not have a cognizable claim of tortious interference with contract under Pennsylvania law and, as such, this claim must be dismissed.

### 7. <u>**Mutual Minds fails to state a cause of action for fraudulent non-disclosure.**</u>

Mutual Minds specifically asserts a claim for fraudulent non-disclosure against iDrive and the Individual Defendants, alleging that they had a duty to disclose their intent to start their own parenting blogs. (FAC ¶¶57–59.) This is a seldom-used claim appropriate for real estate and other transactions with a fiduciary or statutory duty to disclose. *See, e.g.*, *Youndt v. First Nat. Bank of Port Allegany*, 2005 Pa. Super. 42, ¶¶25–27, 868 A.2d 539, 550–51 (2005); *Gnagey Gas & Oil Co. v. Pennsylvania Underground Storage Tank Indemnification Fund*, 82 A.3d 485, 504 (Pa. Commw. Ct. 2013).

Mutual Minds fails to allege this duty to disclose, or the supposed non-disclosure, with the particularity required of fraud claims. Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") requires that, in alleging fraud, "a party must state with particularity the circumstances constituting fraud." As the Third Circuit has explained, Rule 9(b) serves to give defendants "notice of the claims against them, provide[ ] an increased measure of protection for their reputations, and reduce[ ] the number of frivolous suits brought solely to extract settlements." *In re*

*Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir.1997). "Rule 9(b) requires a plaintiff to plead (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his [or her] damage." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir. 2006). Mutual Minds' fraudulent non-disclosure claim fails to satisfy any of these tenets, and instead relies on the untenable assertion that every contracting party *and its principals* owe a personal duty of disclosure of their business plans to all parties with whom they contract. No such duty exists, and the result is an unviable claim. As such, Mutual Minds' claim for fraudulent non-disclosure must be dismissed.

## 8. <u>Mutual Minds fails to state a cause of action for fraudulent inducement.</u>

"Under Pennsylvania law, a claim for fraudulent inducement consists of the following elements: (1) a material misrepresentation of fact; (2) knowledge by the person making the statement of its falsity or recklessness as to its falsity; (3) intent by the person making the statement that the representation will induce another to rely on it; (4) justifiable reliance by the plaintiff on the misrepresentation; (5) damages to the plaintiff as a proximate result of reliance on the misrepresentation; and (6) the specific intent to induce another to enter into a contract when the

person had no duty to do so." *McAllister v. Royal Caribbean Cruises, Ltd.*, No. CIV.A. 02-CV-2393, 2003 WL 23192102, at *5 (E.D. Pa. Sept. 30, 2003). Such a claim is subject to the heightened particularity standard of Rule 9(b). Mutual Minds' fifth claim for fraudulent inducement fails to meet this standard across the board.

For starters, Mutual Minds' sloppy pleading with respect to this claim is evident in the fact that it is asserted "As to All Defendants"—including PCL, the company that, according to Mutual Minds' claim for fraudulent nondisclosure, iDrive and the Individual Defendants concealed from Mutual Minds. Similarly, the alleged "false representation" doesn't pass the common sense test. According to Mutual Minds, the false representation made by Defendants was that Mutual Minds "would no longer be able to access an online portal controlled by iDrive (and likely Miller and Shelly) that Mutual Minds needed to access to determine how much it was to be paid" unless it agreed to the updated Contract. (FAC ¶6.) In other words, iDrive required all Publishers to agree to the updated Contract in order to continue participating in the Publisher program—an event no different than any website requiring users to consent to updated terms and conditions to continue using the website. However, Mutual Minds is reading an element of "impossibility" into the alleged misrepresentation that, even by its own account, is not there. Specifically, Mutual Minds says the "representation was false" because

iDrive arguably "could have made its online portal available to Mutual Minds without forcing Mutual Minds to sign revised terms and conditions." (FAC ¶65.) Even if true, this possibility does not render the alleged representation false, because Defendants did not represent that it was impossible to provide access to the portal. Accordingly, this claim must be dismissed.

## B. Mutual Minds' claims against the Individual Defendants fail across the board.

As stated above, Mutual Minds has failed to state a single valid claim against any Defendant. However, this is especially true of the Individual Defendants, who appear to have been added to this action for nothing more than settlement leverage. Mutual Minds alleges no actionable misconduct specific to either Individual Defendant. Instead, Mutual Minds vaguely alleges that all Defendants collectively engaged in the misconduct. A complaint, such as this one, that lumps all defendants together for different misconduct fails to satisfy the pleading requirements of Rule 8 because it fails to demonstrate each defendant's individual liability. *Sheeran v. Blyth Shipholding S.A.*, No. CV 14-5482 (JBS/AMD), 2015 WL 9048979, at *4 (D.N.J. Dec. 16, 2015); *Galicki v. New Jersey*, No. CIV.A. 14-169 JLL, 2015 WL 3970297, at *3 (D.N.J. June 29, 2015); *In re Balko*, 348 B.R. 684, 694 (W.D. Pa. 2006). Accordingly, the FAC must be dismissed in its entirety against the Individual Defendants for failing to articulate

any claim against them.

## IV.   CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiff's FAC in its

entirety.

Respectfully submitted,

KRONENBERGER ROSENFELD, LLP

By:  s/ Karl S. Kronenberger

Karl S. Kronenberger
(Admitted *pro hac vice*)
150 Post St., Suite 520
San Francisco, CA 94108
(415) 955-1155

GROSS MCGINLEY, LLP
John F. Gross
Malcolm Gross
Samuel E. Cohen
33 South Seventh Street
P.O. Box 4060
Allentown, PA 18105-4060
(610) 820-5450

Attorneys for Defendants TRON
SHELLY, RICK MILLER, iDRIVE
INTERACTIVE, LLC, and PARENTS
FOR CHEAPER LIVING, LLC

Exhibit A

# Network Agreement

The following terms and conditions (this "Agreement") is a legal agreement between 4 Play Media, LLC and its divisions and brands as shown on the attached Exhibit A, which may be periodically modified and updated by Company [attach current list] (interchangeably, "Company" or "Network"), and you (interchangeably, "Publisher," "Affiliate," "You" or "Your"), the user of the website (the "Site"). You and Company may also be individually referred to herein as a "Party" and collectively as "Parties."

These Network Terms and Conditions shall govern Your participation in the Network. You agree to use the Site and any additional services offered by Company in the future only in accordance with this Agreement. Company reserves the right to make changes to the Site and the terms and conditions of this Agreement at any time. Your continued use of the Site after any such modification thereof shall constitute Your consent to such modification.

**Definitions.** "Action" - shall have the meaning set forth in the Program terms for that offer, such as clicks, click-thrus, sales, registrations, impressions or leads.

"Bounty" – means the amount and terms under which You will receive payment for an Action. "CPA" - means a campaign for which Publisher shall be paid on a Cost Per Action basis. CPA stands for Cost Per Action. In Cost Per Action on-line marketing, Company pays a Bounty for an Action that is the result of the advertising services provided by You.

"Creative" - means any type of advertising creative materials used by You to provide advertising services hereunder, including, but not limited to, buttons, banners, fixed graphic images, text-links, and email messages.

"Currently Available Creatives" - means certain Creatives available within the Network from which Publisher may select and display on Publisher's Media, payment for which shall be based on the Bounty set forth in the Program terms for that offer.

"Email Lists" - means lists of email addresses of persons who have provided Publisher with their permission to receive emails containing Creatives via electronic mail over the Internet in accordance with all applicable laws and regulations of the jurisdiction in which the Publisher is located and to which the email be sent.

"IDrive Interactive Network" - means the affiliate network owned by 4 Play Media, LLC, which may generally be accessed at http://www.idriveinteractive.com.

"Incentivized" – means incentives provided by You for an Action by a third party, which may include, but are not limited to, awarding customers cash, points, prizes, contest entries, and any other thing of value transferred or licensed to a user or a person or entity under the control of a user.

"Media" - means Your media properties, such as Your website, affiliated websites, third party websites used by You to provide advertising services (e.g. Google.com or Yahoo.com) or Email Lists.

"Network"  - means any affiliate network owned or operated by 4 Play Media, LLC, including, but not limited to the IDrive Interactive Network.

"Revenue Share" - means a campaign for which You shall be paid on a fixed revenue share basis, based on the revenue generated by You as a result of delivering Creatives and causing a sale by a third party customer. "Website" - means an HTML document containing a set of information available via the Internet.

1. **Background and Use of the Site.**

1.1 The Site allows Company to post offers of advertising programs sponsored by Company or its affiliates on the Network ("Program(s)"). The Programs will specify the amount and terms under which You will receive payment ("Bounties") when the Program's requirements are fulfilled. Bounties are generated from a specified Action identified in a Program, such as clicks, click-thrus, sales, registrations, impressions or leads. The definition of the Action associated with a Program is set forth in the Program's specifications, and such definition shall govern this Agreement.

1.2 If You accept a Program, You agree to place that Program's advertising creative on Your Media, in accordance with the terms of the accepted Program. Only the advertising creative associated with the Program on the Site may be used in conjunction with the Program, and that advertising creative may not be modified by You unless Company provides express written prior consent for the proposed modification after reviewing the proposed modification in its final context.

1.3 No Program may be modified from its terms without the express written consent of Company. This includes providing incentives for customers to view or accept an offer, which are strictly prohibited unless explicitly allowed as part of a Program. Use of spyware or adware (defined as the placing of code or a program, other than a cookie, onto a user's computer that monitors the user's behavior and selects or causes to be selected advertising based on the user's behavior) is prohibited unless explicitly allowed as part of a Program. Use of paid or sponsored search results is prohibited unless explicitly allowed as part of a Program.

1.4 Company may change a Program at any time unless otherwise specified upon reasonable notice to You. Similarly, You may cease to promote previously accepted Programs at any time unless otherwise specified.

1.5 Company is responsible for displaying and administering all active Programs and tracking the payments owed. Company shall compile, calculate and electronically provide data required to determine Your billing and compensation ("Data"). Company's figures and calculations regarding the Data shall be final and binding. Any questions regarding the Data provided by Company must be submitted in writing within thirty (30) calendar days of receipt or availability

of the Data on the Site, otherwise all claims relating to the accuracy of the Data will be waived, and the Data will be deemed accurate and final and accepted as such by You.

2. **License.**

2.1 All websites, newsletters, companies, or individuals need official approval from Company before they can become an affiliate publisher granted access to the Site ("Affiliate"). Only websites, affiliated websites and email distribution lists ("Affiliate Content") that have been reviewed and approved are permitted to use the Site. Company reserves the right to withhold, refuse or withdraw approval for any reason or no reason, in its sole discretion, at any time.

2.3 Company grants You a non-transferable, non-exclusive, revocable, limited license, if approved, to use the Site and any data, reports, information or analyses arising out of such use, subject to the terms and conditions set forth herein.

2.4 You acknowledge and agree that You do not have, nor will You claim any right, title or interest in the Site software, applications, data, methods of doing business or any elements thereof, except through some written agreement separate and distinct from this Agreement.

2.5 You may only access the Site via web browser, email or in a manner approved by Company. Site integration tags must not be altered. Altering tags may jeopardize Your ability to be paid for Actions, or to otherwise receive Bounties.

2.6 You acknowledge that Your license to the Site and any content therein is strictly limited solely to You.  You must not allow access to the Site by any third parties the use of Your Site access. Any access to the Site by a third party not authorized by Company to do so shall be considered trespass.  If an unauthorized third party uses Your Site access to gain access to the Site, such access shall constitute trespass and shall constitute a violation by You subject to Section 4.7(iii).  Company reserves all other rights (legal or otherwise) that it may have against You in the event that a trespass occurs using Your Site access.

3.  **Prohibited Conduct**

3.1 You must not promote any Programs using fraudulent means.  "Fraudulent means" include, but are not limited to: i. Adding leads or clicks through fraudulent traffic generation, such as prepopulation of forms or via other such mechanisms not approved by Company; ii. Using "impression spam," the frequent or automated searching of a search term used to reduce competitors' click-thru rates on their advertisements, in conjunction with paid search campaigns; iii. Altering the creative materials provided in the Program in any way, unless authorized in writing by Company or in the Program terms; or iv. Any illegal activity whatsoever, under the laws and treaties of the United States, any of its states or localities, or under the laws of any nation who has reciprocal treaty rights with the United States for the enforcement of its laws or judgments relating to those laws;

3.2 Your advertising for the Programs must not include any of the following: i. A site that consists solely of a list of links or advertisements; ii. A site whose content consists solely of an

advertisement from a Program; iii. A site that exclusively offers incentives to users to click on ads, unless the only Program(s) run by the Affiliate explicitly allow incentives; incentives include, but are not limited to, awarding customers cash, points, prizes, contest entries, and any other thing of value transferred or licensed to a user or a person or entity under the control of a user; iv. A site that includes spawning process pop-ups or that causes more than one pop-up window to appear; v. Third party website internal communications systems, including but not limited to internal website email (e.g. Myspace.com email), bulletin boards, chat rooms, or comments. vi. Content or material that may infringe on any personal property rights, intellectual property rights or rights to be free of tortious behavior, including, but not limited to: a. Racial, ethnic, political, religious, gender, or lifestyle hate-mongering or otherwise objectionable content; b. Investment, money-making opportunities or advice not permitted under law; c. Gratuitous violence or profanity; d. Material that defames, abuses, or threatens or urges physical harm to others; e. Promotion of illegal substances or activities such as illegal online gambling, how to build a bomb, counterfeiting money, etc.; f. Software or other media pirating (e.g., Warez, Hotline); g. Hacking, spoofing, phishing or Phreaking; vii. A site that is not fully functional at all levels, with no "under construction" sites or sections; viii. Any spoofing, redirecting, or trafficking from or to adult-related websites in an effort to gain traffic; ix. Use of any spyware or malware or any program that generates new browser windows or tabs based on behavioral profiles, except to the extent such use is expressly approved in writing by Company; or x. Email messages that constitute Unsolicited Commercial Email. Unsolicited Commercial Email includes all email so defined by the laws of the United States or any of the several states. Unsolicited Commercial Email also includes email messages with fraudulent or deceptive "from" or "subject" lines (including the alteration of "from" or "subject" lines where the Program terms set forth "from" and "subject" lines to be used), fraudulent or deceptive headers, or fraudulent or deceptive initiating-IP addresses. In the event that Company suspects that You may have sent an email that violates any of these laws or Company's policies regarding Unsolicited Commercial Email, You agree to cooperate fully with Company's investigation, and to send Company all information relevant to the investigation that it requests within twenty-four (24) hours of the sending of the request by Company.

## 4. **Compliance.**

4.1 Company has the right, but not the obligation to monitor the Network for fraudulent activity. Company may freeze Your account and prohibit Your access to that account (including a suspension of its payment obligations to You) pending the conclusion of its investigation if Company reasonably believes the account has: i. Click-thru rates that are much higher than industry averages and where solid justification is not evident; ii. Only click programs generating clicks with no indication by site traffic that it can sustain the clicks reported; iii. Shown fraudulent leads as determined by our clients or by third parties; iv. Used fake redirects, automated software, and/or fraud to generate clicks or leads from our programs; or v. Violated any prohibitions contained in this Agreement.

4.2 Company may, in its sole discretion, designate a Compliance Officers. The Compliance Officers may enforce the terms of this Agreement (including but not limited to Sections 2, 3 and 5) and Your compliance with those terms. The Compliance Officers shall conduct initial investigations of alleged breaches of this Agreement by You.  You agree to provide any

information requested by the Compliance Officers that is reasonably related to Your compliance with the terms of this Agreement. Requests for opt-in information must be complied with in one (1) business day or less. Other requests for information from the Compliance Officers must be complied with in the timeframe set forth by a Compliance Officer.  If no timeframe is set forth by a Compliance Officer, You must comply in a commercially reasonable time, which shall not exceed five (5) business days.

4.3 You agree to allow Company to use any means of monitoring of your promotional activities on behalf of the Programs.

4.4 Your promotion of particular Programs may be subject to additional rules, as set forth in the Program, and Your promotion of a Program constitutes your acceptance of those additional rules and your agreement not to breach said rules, which are incorporated herein in relation to that Program.  Violation of the additional rules in a Program shall constitute a violation of the terms of this Agreement, and shall subject you to the disciplinary procedures set forth below.

4.5 Company has a zero-tolerance policy toward violations of the law, in particular the CAN-SPAM Act of 2003, laws governing false and misleading advertising, the Children's Online Privacy Protection Act (COPPA), and the Michigan and Utah child protection registries.  Any violation of those laws or their associated regulations shall subject you to the disciplinary procedures set forth below.  For any such violation, Company reserves any and all rights it may have against You included in and independent of this Agreement.

4.6 Company and its Compliance Officers may monitor incentivized promotion of Programs in particular.  Violations of the rules governing incentivized promotion for a Program are a violation of the Program's additional rules.  For any such violation, Company reserves any and all rights, civil and criminal, it may have against You included in and independent of this Agreement.

4.7 If You are in violation of the above terms, You may be terminated from the Network, pursuant to Section 7.2.  You will receive no payments for any Bounties not previously paid if you are terminated under this provision, as per Section 7.3.  If payments were made to You after You committed the violation that resulted in Your termination, but before Company determined that You had violated this Agreement, You shall refund said funds to Company within fifteen (15) calendar days of the termination of this Agreement.

4.8 Company and its Compliance Officers may, in their sole discretion, choose alternative forms of discipline for violations of the above terms, including, but not limited to, their exercise of Company's rights under Sections 7.2 and 7.3, or the use of any of the forms of discipline contained in Section 4.7.

4.9 Company may, following a reasonable determination in Company's sole discretion that an Action is invalid (whether because the Action was caused by fraud or otherwise), seek a refund or setoff of future Bounties (or both) from You for the value of any payments previously made by Company that reasonably relate to that invalid Action.  Company may seek such refunds or setoffs at any time during this Agreement and for up to four (4) year following the termination of

this Agreement.  You expressly consent to such a setoff in advance and You agree to provide such a refund within five (5) business days of Company's written notice to You of Your obligation to provide the refund.  This remedy is in addition to all other rights, legal or otherwise, as Company may have against You as a result of the invalid Action(s).

5. **Payment.**

5.1 You will be paid per the occurrence of an Action. You understand and agree that Bounties will be owed to You from third party Advertisers whose Programs appear on the Site on terms as outlined in Company's agreement with Advertiser, which shall in no event be greater than thirty (30) days following the end of the month in which the Bounties were earned.  Payment for said Bounties shall generally be made to You by Company within thirty (30) days of the end of the month in which the Bounties were earned. In no event shall Company be liable to you for any Bounties until and unless Company receives payment from the Advertiser for the associated Actions.  All payments are based on actual figures as defined, accounted and audited by Advertiser and/or Company.

5.2 All Bounties will be paid in US dollars ($US), except where explicitly stated otherwise in the Program or as otherwise set forth by Company. No payments will be issued for any amounts less than $25 US Dollars (or their foreign currency equivalents), except in the sole discretion of Company.

5.3 If You are a U.S. resident, Your account must have a unique, valid taxpayer identification number (TIN) or valid Social Security Number (SSN) associated with it. You must have a valid, completed Form W8 or Form W9 on file with Company, and Company shall have no obligation to pay You until the appropriate form is filed with Company.

5.4 Company will generally facilitate payment by disbursing the earned portion of lump sum aggregate payments to You within thirty (30) days of receipt of payment from Advertiser, unless otherwise explicitly stated in the Program or unless some or all of the payment has been forfeited by You or is otherwise in dispute. Company will disburse this payment electronically unless You do not provide information allowing it to do so, or You request that it provide payment through some other form.

5.5 In the event Company fails to receive payment in full from Advertiser it shall have no payment obligation to You. You accept all risks associated with non-payment by the Advertiser, and explicitly acknowledge that Company is not a guarantor of any payment or other obligations of any Advertiser. If Advertiser does not pay on time, Company will notify You and offer its best efforts in matters related to collections, but it is not contractually bound to do so.

5.6 Company may, in its sole discretion, decide to pay You for any Bounties owed to you by Advertiser in the event Advertiser does not timely pay Company. In the event that Company decides to make such a payment to You, You agree to assign all rights to future payments from Advertiser to the Company to the extent that Company has already paid an equivalent amount to those Bounties to You.

5.7 Company will not pay for any Actions that occur before a Program is initiated, or after a Program terminates. Invoices submitted to Company and payments made to You shall be based on the Actions and corresponding Bounties as reported by Company, based on online or offline reporting of the Data by Company. Company and Advertisers will not be responsible to compensate You for Actions that are not recorded due to Your error.

5.8 Company will not pay any interest or late payment fees on any Bounties or other payments held or withheld by Company, unless Company otherwise explicitly agrees in writing to do so.

## 6. **Representations and Warranties.**

6.1 You represent and warrant that Your Media are in compliance with all applicable laws and do not contain or promote, nor link to, another website that contains or promotes, libelous, defamatory, abusive, violent, prejudicial, obscene, sexually explicit or illegal content.

6.2 You represent and warrant that all email associated with any Program sent by You shall include all features required by the laws and regulations of the United States of America and of the several states (including but not limited to the CAN-SPAM Act of 2003) and the laws of the jurisdiction where You are located and to which you are sending email. You represent and warrant that all emails associated with any Program sent by You shall contain a physical mailing address for You where recipients may contact You. You further represent and warrant that all email associated with any Program sent by You shall include a functioning reply-to address allowing recipients to opt-out of further communications from You or from the Advertiser. You represent and warrant that upon receipt of an opt-out message from a recipient, that you will cease any further email communication with that email address within ten (10) calendar days, unless the recipient subsequently affirmatively requests that such email communication be initiated again.

6.3 You represent and warrant that the recipients of all email addresses used by you in connection with any Program have manifested affirmative consent to receive commercial emails from You. You represent and warrant that none of the email addresses of any emails sent by you in connection with any Program were obtained by You through email harvesting or dictionary attacks, whether by You or by a third party.

6.4 You represent and warrant that You will not use fraud or deceit when marketing a Program or presenting a Program to consumers.

6.5 You represent and warrant that You will display the creative content of a Program exactly as it appears on the Program and will not alter any creative that has been submitted to the Site without the express written authorization of Company.

6.6 You represent and warrant that you will not post any specific messages relating to Company or any Program to newsgroups, chat rooms, bulletin boards, blog comments, that utilize social website internal email systems, or any other places unless expressly approved in writing from Company. You may post messages which are generic in nature and do not mention any specific client or offer, which are expressly approved in writing from Company.

6.7 You represent and warrant that You will not promote any Programs via a website or link to other websites that contain any pornographic, racial, ethnic, political, software pirating (e.g. Warez) or hacking, hate-mongering, or otherwise objectionable content.

6.8 You represent and warrant that all of Your efforts associated with Company and any of its Programs comply with the laws of the United States and of the several states, and any other laws of any other jurisdictions which are applicable to You. You will not engage in or promote any illegal activities of any kind in association with Company or any of its Programs.

6.9 You represent and warrant that You own or have the legal right to use and distribute all content, copyrighted material, products, and services displayed on Your Media. You further represent and warrant that you have the right, power, and authority to enter into this Agreement and grant the rights specified herein.

6.10 You represent and warrant that You will not attempt in any way to alter, modify, eliminate, conceal, or otherwise render inoperable or ineffective the Site tags, source codes, links, pixels, modules or other data provided by or obtained from Company that allows Company to measure ad performance and provide its service ("Site Data"). If instructed to do so by Company and/or if this Agreement terminates, You will immediately remove and discontinue the use of any Site Data.

6.11 You acknowledge that Company does not represent, warrant, or make any specific or implied promises as to the successful outcome, or any outcome, of any Program or Programs.

6.12 You acknowledge that if any errors or undesirable results occur to You or a third party that do not result from the willful misconduct by Company, gross neglect of Company, or breach of this Agreement by Company, then Company shall not be responsible for any losses or damages You may incur and You may not be compensated for said losses or damages by Company.

6.13 If You are notified that fraudulent activities may be occurring on your Media, and You do not take immediate actions to stop the fraudulent activities, then You are responsible for all associated costs and legal fees resulting from these fraudulent activities that may be incurred by Company or Advertisers. Such responsibility includes, but is not limited to, the indemnity provided by You in Section 9, below.

6.14  If You have affiliates, publishers, or other agents performing any portion of Your obligations or services under this Agreement, You represent and warrant that all such affiliates, publishers, or other agents will agree or have agreed to substantially similar prohibitions on their conduct as are contained in this Agreement.  You further agree that the acts or omissions of any of Your affiliates, publishers, or other agents shall be as if those acts or omissions were Your acts or omissions for all purposes under this Agreement (including such times as the agent may act outside of their scope of agency), and You shall in all other ways be obligated as a principal for the acts or omissions of your agents.

7. **Termination.**

7.1 This Agreement shall commence upon Your acceptance and remain in effect until terminated. This Agreement may be terminated by either Party upon three (3) calendar days' notice, or immediately by Company if Company reasonably determines You breached this Agreement. This Agreement shall terminate immediately upon the windup and dissolution or insolvency of either Party, whether voluntary or not.

7.2 Company reserves the right, in its sole and absolute discretion, to immediately terminate a Program or your participation in a Program at any time for any reason. Company also reserves the right, in its sole and absolute discretion, to remove any advertisements related to Company or to a Program at any time for any reason. Company further reserves the right to immediately terminate Your access to the Site at any time without notice.

7.3 Notice of termination of this Agreement may be provided in written form, and may be delivered via letter, facsimile, or e-mail (though any writing expressing the termination of this Agreement is sufficient) and will take effect three (3) calendar days after the notice is sent, or immediately upon receipt by Affiliate, whichever occurs first. All Bounties due to You will be paid during the next billing cycle. If You commit any violations of Section 3 of this Agreement, then all payments owed to You are forfeited, as determined in the sole and absolute discretion of Company.

7.4 The terms of Sections 4, 8, 9, 10, 12, 14 and 15 and any other provision that would reasonably be interpreted to survive termination shall remain in full force and effect after termination of this Agreement. All payment obligations of either party to the other shall survive until fully performed, unless such obligation is expressly waived herein.

**8. Confidential Information; Non-Disclosure.**

8.1 All information submitted by end-user customers pursuant to a Program is proprietary to and owned by Company or its affiliates. Such customer information is confidential and may not be disclosed by You. In addition, You acknowledge that all non-public information, data and reports received from Company hereunder or as part of the services hereunder is proprietary to and owned by Company ("Confidential Information").

8.2 You agree not to disclose the terms of any Program or Programs, including the CPA value, to any third party without the express written consent of Company, and that such constitutes Confidential Information.  You agree not to disclose Your Site access information (e.g. Your username and password) to any third party that is not an employee, officer, or director of You, and that Your Site access information constitutes Confidential Information.

8.3 All Confidential Information is or may be protected by copyright, trademark, trade secret and other intellectual property law, as appropriate. You agree not to reproduce, disseminate, sell, distribute or commercially exploit any proprietary or onfidential information in any manner. These non-disclosure obligations shall survive the termination of this Agreement for a period of five (5) years.

8.4 This section does not bind Company or You in the event such information is required to be disclosed by operation of law. If a request is made of You to disclose such information, you must immediately inform Company via written notice sufficiently promptly to allow Company to seek a Protective Order prior to the time commanded to produce or disclose such Confidential Information, and You agree to cooperate in whatever way Company requests to attempt to protect that information from disclosure by operation of law.

## 9. **Limitation of Liability; Disclaimer of Warranty.**

9.1 IN NO EVENT SHALL COMPANY BE LIABLE FOR ANY DAMAGES OF ANY KIND ARISING FROM YOUR USE OF THE SITE (INCLUDING YOUR INABILITY TO ACCESS OR USE THE SITE), OPERATION OF A PROGRAM (INCLUDING YOUR INABILITY TO ACCESS OR USE AN ADVERTISER'S WEBSITE), OR YOUR DISPLAY OF ANY PROGRAM CREATIVE ON YOUR MEDIA, INCLUDING BUT NOT LIMITED TO BROKEN IMAGES, UNAVAILABILITY OF SOME OR ALL OF THE SITE OR OTHER SERVICES PROVIDED BY COMPANY), SPECIAL, INDIRECT, INCIDENTAL, LOST PROFIT, PUNITIVE AND CONSEQUENTIAL DAMAGES, EVEN IF COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

9.2 THE INFORMATION, CONTENT AND SERVICES ON THE SITE ARE PROVIDED ON AN "AS IS" BASIS WITH NO WARRANTY. YOU USE THE SITE AND RUN PROGRAMS AT YOUR OWN RISK. TO THE MAXIMUM EXTENT PERMITTED BY LAW, COMPANY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, WITH RESPECT TO THE OPERATION OF THE SITE, THE INFORMATION, SERVICES, AND CONTENT INCLUDED ON THE SITE AND PROVIDED BY COMPANY, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. COMPANY DOES NOT REPRESENT OR WARRANT THAT THE INFORMATION ON THIS SITE OR PROVIDED BY COMPANY IS ACCURATE, COMPLETE OR CURRENT.

9.3 IN THE EVENT THAT COMPANY IS DETERMINED TO HAVE DAMAGED YOU, WHETHER THROUGH BREACH OF THIS AGREEMENT OR OTHERWISE, YOU AGREE THAT THE MAXIMUM LIABILITY COMPANY SHALL INCUR TO YOU IS LIMITED TO THE SUM OF THE BOUNTIES COMPANY PAID TO YOU IN THE SIX MONTHS PRIOR TO THE ACTS OR OMISSIONS CAUSING SUCH LIABILITY. IF THIS AGREEMENT BETWEEN YOU AND COMPANY WAS EXECUTED LESS THAN SIX MONTHS PRIOR TO THE ACTS OR OMISSIONS CAUSING SUCH LIABILITY, THAN THE MAXIMUM LIABILITY COMPANY SHALL INCUR TO YOU IS LIMITED TO THE AVERAGE DAILY BOUNTY EARNED BY YOU DURING THE PERIOD FOLLOWING EXECUTION OF THE AGREEMENT MULTIPLIED BY ONE HUNDRED EIGHTY (180).

## 10. **Indemnity.**

10.1 You shall indemnify, defend and hold Company (including Company's parents, successors, subsidiaries, officers, directors, shareholders, employees, and other agents) harmless from and

against any and all claims, allegations, liabilities, costs, expenses (including reasonable attorneys' fees and reasonable other professionals' fees) or other damages by third parties arising out of Your: (a) improper use of the Site; (b) improper operation of a Program; (c) breach or violation of this Agreement; or (d) willful misconduct or gross negligence not covered by the terms of this Agreement. Company shall indemnify, defend and hold You harmless from and against any and all claims allegations, liabilities, costs, expenses (including reasonable attorneys' fees) or other damages by third parties arising out of any actual infringement of intellectual property rights resulting from Your unaltered display of Company's advertising creative provided in connection with operating a Program, so long as Your display of Company's advertising creative does not breach this Agreement.

## 11. **Assignment and Jurisdiction.**

11.1 Company may assign this Agreement to a subsidiary or business successor without notice to You or your consent. You may not assign this Agreement without the prior written consent of Company, which shall not be unreasonably withheld. This Agreement shall be construed and governed by the law of the Commonwealth of Pennsylvania. You expressly consent to the exclusive venue and personal jurisdiction of the state and federal courts located in Cumberland County, Pennsylvania for any actions arising from or relating to this Agreement.

## 12. **Severability.**

12.1 If any provision of this Agreement is held to be invalid, illegal or unenforceable for any reason, such invalidity, illegality or unenforceability shall not effect any other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had not been contained herein.

## 13. **Force Majeure.**

13.1 Neither Party shall be liable to the other by reason of failure or delay in the performance of its obligations hereunder on account of Acts of God, fires, storms, war, terrorism, governmental action, labor conditions, riots, earthquakes, floods, other natural disasters, interruption in Internet service, or any other cause which is beyond the reasonable control of such Party.

## 14. **Attorneys' Fees and Other Collection Costs.**

14.1 Company shall be entitled to an award of its reasonable costs and expenses, including attorneys' fees, other professionals' fees, and other collections costs, and prejudgment interest at the maximum legal rate, in any action or proceeding against You arising out of this Agreement. You shall be entitled to an award of your reasonable costs and expenses, including attorneys' fees, in any action or proceeding arising out of this Agreement resulting from the gross negligence or willful misconduct of Company.

## 15. **Miscellaneous.**

15.1 This Agreement contains the sole and entire agreement and understanding between the Parties relating to the subject matter herein, and merges all prior and contemporaneous discussions, contracts, understandings and agreements, whether through officers, directors, salespersons, employees or consultants, unless otherwise stated in a writing signed by both Parties. No amendment to or modification of this Agreement or any Program shall be valid or binding on the Company unless it is signed by the Company's President.  Each Party is an independent contractor and not a partner, joint venturer or employee of the other. All notices to You shall be sent to the addresses submitted by You when signing up for the service by certified mail, fax, email or courier. You shall send all notices to Company to the contact information listed on the Site.

15.2 Company reserves the right to change any conditions of this Agreement at any time, with or without notice. Such changes shall affect all future use or uses of Site or Programs by You, and your future use of the Site or Company's Programs constitute affirmative consent to the new agreement.

Publisher _____

Print Name_____

Signature _____

Date_____


4 Play Media, LLC

_____

By: _____

Its: _____

Date: _____

Exhibit B

## Network Terms and Conditions

The following terms and conditions (this "Agreement") is a legal agreement between iDrive Interactive, LLC and its divisions and brands [www.idriveinteractive.com] (interchangeably, "Company" or "Network"), and you (interchangeably, "Publisher," "Affiliate," "You" or "Your"), the user of the website (the "Site"). You and Company may also be individually referred to herein as a "Party" and collectively as "Parties."

These Network Terms and Conditions shall govern Your participation in the Network. You agree to use the Site and any additional services offered by Company in the future only in accordance with this Agreement. Company reserves the right to make changes to the Site and the terms and conditions of this Agreement at any time. Your continued use of the Site after any such modification thereof shall constitute Your consent to such modification.

**Definitions.** "Action" - shall have the meaning set forth in the Program terms for that offer, such as clicks, click-thrus, sales, registrations, impressions or leads.

"Bounty" – means the amount and terms under which You will receive payment for an Action. "CPA" - means a campaign for which Publisher shall be paid on a Cost Per Action basis. CPA stands for Cost Per Action. In Cost Per Action on-line marketing, Company pays a Bounty for an Action that is the result of the advertising services provided by You.

"Creative" - means any type of advertising creative materials used by You to provide advertising services hereunder, including, but not limited to, buttons, banners, fixed graphic images, text-links, and email messages.

"Currently Available Creatives" - means certain Creatives available within the Network from which Publisher may select and display on Publisher's Media, payment for which shall be based on the Bounty set forth in the Program terms for that offer.

"Email Lists" - means lists of email addresses of persons who have provided Publisher with their permission to receive emails containing Creatives via electronic mail over the Internet in accordance with all applicable laws and regulations of the jurisdiction in which the Publisher is located and to which the email be sent.

"IDrive Interactive Network" - means the affiliate network owned by iDrive Interactive, LLC, which may generally be accessed at http://www.idriveinteractive.com.

"Incentivized" – means incentives provided by You for an Action by a third party, which may include, but are not limited to, awarding customers cash, points, prizes, contest entries, and any other thing of value transferred or licensed to a user or a person or entity under the control of a user.

"Media" - means Your media properties, such as Your website, affiliated websites, third party websites used by You to provide advertising services (e.g. Google.com or Yahoo.com) or Email Lists.

"Network"  - means any affiliate network owned or operated by iDrive Interactive, LLC, including, but not limited to the IDrive Interactive Network.

"Revenue Share" - means a campaign for which You shall be paid on a fixed revenue share basis, based on the revenue generated by You as a result of delivering Creatives and causing a sale by a third party customer. "Website" - means an HTML document containing a set of information available via the Internet.

1. **Background and Use of the Site.**

1.1 The Site allows Company to post offers of advertising programs sponsored by Company or its affiliates on the Network ("Program(s)"). The Programs will specify the amount and terms under which You will receive payment ("Bounties") when the Program's requirements are fulfilled. Bounties are generated from a specified Action identified in a Program, such as clicks, click-thrus, sales, registrations, impressions or leads. The definition of the Action associated with a Program is set forth in the Program's specifications, and such definition shall govern this Agreement.

1.2 If You accept a Program, You agree to place that Program's advertising creative on Your Media, in accordance with the terms of the accepted Program. Only the advertising creative associated with the Program on the Site may be used in conjunction with the Program, and that advertising creative may not be modified by You unless Company provides express written prior consent for the proposed modification after reviewing the proposed modification in its final context.

1.3 No Program may be modified from its terms without the express written consent of Company. This includes providing incentives for customers to view or accept an offer, which are strictly prohibited unless explicitly allowed as part of a Program. Use of spyware or adware (defined as the placing of code or a program, other than a cookie, onto a user's computer that monitors the user's behavior and selects or causes to be selected advertising based on the user's behavior) is prohibited unless explicitly allowed as part of a Program. Use of paid or sponsored search results is prohibited unless explicitly allowed as part of a Program.

1.4 Company may change a Program at any time unless otherwise specified upon reasonable notice to You. Similarly, You may cease to promote previously accepted Programs at any time unless otherwise specified.

1.5 Company is responsible for displaying and administering all active Programs and tracking the payments owed. Company shall compile, calculate and electronically provide data required to determine Your billing and compensation ("Data"). Company's figures and calculations regarding the Data shall be final and binding. Any questions regarding the Data provided by Company must be submitted in writing within thirty (30) calendar days of receipt or availability of the Data on the Site, otherwise all claims relating to the accuracy of the Data will be waived, and the Data will be deemed accurate and final and accepted as such by You.

2. **License.**

2.1 All websites, newsletters, companies, or individuals need official approval from Company before they can become an affiliate publisher granted access to the Site ("Affiliate"). Only websites, affiliated websites and email distribution lists ("Affiliate Content") that have been reviewed and approved are permitted to use the Site. Company reserves the right to withhold, refuse or withdraw approval for any reason or no reason, in its sole discretion, at any time.

2.3 Company grants You a non-transferable, non-exclusive, revocable, limited license, if approved, to use the Site and any data, reports, information or analyses arising out of such use, subject to the terms and conditions set forth herein.

2.4 You acknowledge and agree that You do not have, nor will You claim any right, title or interest in the Site software, applications, data, methods of doing business or any elements thereof, except through some written agreement separate and distinct from this Agreement.

2.5 You may only access the Site via web browser, email or in a manner approved by Company. Site integration tags must not be altered. Altering tags may jeopardize Your ability to be paid for Actions, or to otherwise receive Bounties.

2.6 You acknowledge that Your license to the Site and any content therein is strictly limited solely to You.  You must not allow access to the Site by any third parties the use of Your Site access. Any access to the Site by a third party not authorized by Company to do so shall be considered trespass.  If an unauthorized third party uses Your Site access to gain access to the Site, such access shall constitute trespass and shall constitute a violation by You subject to Section 4.7(iii).  Company reserves all other rights (legal or otherwise) that it may have against You in the event that a trespass occurs using Your Site access.

3. **Prohibited Conduct**

3.1 You must not promote any Programs using fraudulent means.  "Fraudulent means" include, but are not limited to: i. Adding leads or clicks through fraudulent traffic generation, such as prepopulation of forms or via other such mechanisms not approved by Company; ii. Using "impression spam," the frequent or automated searching of a search term used to reduce competitors' click-thru rates on their advertisements, in conjunction with paid search campaigns; iii. Altering the creative materials provided in the Program in any way, unless authorized in writing by Company or in the Program terms; or iv. Any illegal activity whatsoever, under the laws and treaties of the United States, any of its states or localities, or under the laws of any nation who has reciprocal treaty rights with the United States for the enforcement of its laws or judgments relating to those laws;

3.2 Your advertising for the Programs must not include any of the following: i. A site that consists solely of a list of links or advertisements; ii. A site whose content consists solely of an advertisement from a Program; iii. A site that exclusively offers incentives to users to click on ads, unless the only Program(s) run by the Affiliate explicitly allow incentives; incentives include, but are not limited to, awarding customers cash, points, prizes, contest entries, and any other thing of value transferred or licensed to a user or a person or entity under the control of a user; iv. A site that includes spawning process pop-ups or that causes more than one pop-up

window to appear; v. Third party website internal communications systems, including but not limited to internal website email (e.g. Myspace.com email), bulletin boards, chat rooms, or comments. vi. Content or material that may infringe on any personal property rights, intellectual property rights or rights to be free of tortious behavior, including, but not limited to: a. Racial, ethnic, political, religious, gender, or lifestyle hate-mongering or otherwise objectionable content; b. Investment, money-making opportunities or advice not permitted under law; c. Gratuitous violence or profanity; d. Material that defames, abuses, or threatens or urges physical harm to others; e. Promotion of illegal substances or activities such as illegal online gambling, how to build a bomb, counterfeiting money, etc.; f. Software or other media pirating (e.g., Warez, Hotline); g. Hacking, spoofing, phishing or Phreaking; vii. A site that is not fully functional at all levels, with no "under construction" sites or sections; viii. Any spoofing, redirecting, or trafficking from or to adult-related websites in an effort to gain traffic; ix. Use of any spyware or malware or any program that generates new browser windows or tabs based on behavioral profiles, except to the extent such use is expressly approved in writing by Company; or x. Email messages that constitute Unsolicited Commercial Email. Unsolicited Commercial Email includes all email so defined by the laws of the United States or any of the several states. Unsolicited Commercial Email also includes email messages with fraudulent or deceptive "from" or "subject" lines (including the alteration of "from" or "subject" lines where the Program terms set forth "from" and "subject" lines to be used), fraudulent or deceptive headers, or fraudulent or deceptive initiating-IP addresses. In the event that Company suspects that You may have sent an email that violates any of these laws or Company's policies regarding Unsolicited Commercial Email, You agree to cooperate fully with Company's investigation, and to send Company all information relevant to the investigation that it requests within twenty-four (24) hours of the sending of the request by Company.

## 4. **Compliance.**

4.1 Company has the right, but not the obligation to monitor the Network for fraudulent activity. Company may freeze Your account and prohibit Your access to that account (including a suspension of its payment obligations to You) pending the conclusion of its investigation if Company reasonably believes the account has: i. Click-thru rates that are much higher than industry averages and where solid justification is not evident; ii. Only click programs generating clicks with no indication by site traffic that it can sustain the clicks reported; iii. Shown fraudulent leads as determined by our clients or by third parties; iv. Used fake redirects, automated software, and/or fraud to generate clicks or leads from our programs; or v. Violated any prohibitions contained in this Agreement.

4.2 Company may, in its sole discretion, designate a Compliance Officers. The Compliance Officers may enforce the terms of this Agreement (including but not limited to Sections 2, 3 and 5) and Your compliance with those terms. The Compliance Officers shall conduct initial investigations of alleged breaches of this Agreement by You.  You agree to provide any information requested by the Compliance Officers that is reasonably related to Your compliance with the terms of this Agreement. Requests for opt-in information must be complied with in one (1) business day or less. Other requests for information from the Compliance Officers must be complied with in the timeframe set forth by a Compliance Officer.  If no timeframe is set forth

by a Compliance Officer, You must comply in a commercially reasonable time, which shall not exceed five (5) business days.

4.3 You agree to allow Company to use any means of monitoring of your promotional activities on behalf of the Programs.

4.4 Your promotion of particular Programs may be subject to additional rules, as set forth in the Program, and Your promotion of a Program constitutes your acceptance of those additional rules and your agreement not to breach said rules, which are incorporated herein in relation to that Program.  Violation of the additional rules in a Program shall constitute a violation of the terms of this Agreement, and shall subject you to the disciplinary procedures set forth below.

4.5 Company has a zero-tolerance policy toward violations of the law, in particular the CAN-SPAM Act of 2003, CASL, laws governing false and misleading advertising, the Children's Online Privacy Protection Act (COPPA), and the Michigan and Utah child protection registries. Any violation of those laws or their associated regulations shall subject you to the disciplinary procedures set forth below. For any such violation, Company reserves any and all rights it may have against You included in and independent of this Agreement.

4.6 Company and its Compliance Officers may monitor incentivized promotion of Programs in particular.  Violations of the rules governing incentivized promotion for a Program are a violation of the Program's additional rules.  For any such violation, Company reserves any and all rights, civil and criminal, it may have against You included in and independent of this Agreement.

4.7 If You are in violation of the above terms, You may be terminated from the Network, pursuant to Section 7.2.  You will receive no payments for any Bounties not previously paid if you are terminated under this provision, as per Section 7.3.  If payments were made to You after You committed the violation that resulted in Your termination, but before Company determined that You had violated this Agreement, You shall refund said funds to Company within fifteen (15) calendar days of the termination of this Agreement.

4.8 Company and its Compliance Officers may, in their sole discretion, choose alternative forms of discipline for violations of the above terms, including, but not limited to, their exercise of Company's rights under Sections 7.2 and 7.3, or the use of any of the forms of discipline contained in Section 4.7.

4.9 Company may, following a reasonable determination in Company's sole discretion that an Action is invalid (whether because the Action was caused by fraud or otherwise), seek a refund or setoff of future Bounties (or both) from You for the value of any payments previously made by Company that reasonably relate to that invalid Action.  Company may seek such refunds or setoffs at any time during this Agreement and for up to four (4) year following the termination of this Agreement.  You expressly consent to such a setoff in advance and You agree to provide such a refund within five (5) business days of Company's written notice to You of Your obligation to provide the refund.  This remedy is in addition to all other rights, legal or otherwise, as Company may have against You as a result of the invalid Action(s).

5. **Payment.**

5.1 You will be paid per the occurrence of an Action. You understand and agree that Bounties will be owed to You from third party Advertisers whose Programs appear on the Site on terms as outlined in Company's agreement with Advertiser, which shall in no event be greater than thirty (30) days following the end of the month in which the Bounties were earned.  Payment for said Bounties shall generally be made to You by Company within thirty (30) days of the end of the month in which the Bounties were earned. In no event shall Company be liable to you for any Bounties until and unless Company receives payment from the Advertiser for the associated Actions.  All payments are based on actual figures as defined, accounted and audited by Advertiser and/or Company.

5.2 All Bounties will be paid in US dollars ($US), except where explicitly stated otherwise in the Program or as otherwise set forth by Company. No payments will be issued for any amounts less than $25 US Dollars (or their foreign currency equivalents), except in the sole discretion of Company.

5.3 If You are a U.S. resident, Your account must have a unique, valid taxpayer identification number (TIN) or valid Social Security Number (SSN) associated with it. You must have a valid, completed Form W8 or Form W9 on file with Company, and Company shall have no obligation to pay You until the appropriate form is filed with Company.

5.4 Company will generally facilitate payment by disbursing the earned portion of lump sum aggregate payments to You within thirty (30) days of receipt of payment from Advertiser, unless otherwise explicitly stated in the Program or unless some or all of the payment has been forfeited by You or is otherwise in dispute. Company will disburse this payment electronically unless You do not provide information allowing it to do so, or You request that it provide payment through some other form.

5.5 In the event Company fails to receive payment in full from Advertiser it shall have no payment obligation to You. You accept all risks associated with non-payment by the Advertiser, and explicitly acknowledge that Company is not a guarantor of any payment or other obligations of any Advertiser. If Advertiser does not pay on time, Company will notify You and offer its best efforts in matters related to collections, but it is not contractually bound to do so.

5.6 Company may, in its sole discretion, decide to pay You for any Bounties owed to you by Advertiser in the event Advertiser does not timely pay Company. In the event that Company decides to make such a payment to You, You agree to assign all rights to future payments from Advertiser to the Company to the extent that Company has already paid an equivalent amount to those Bounties to You.

5.7 Company will not pay for any Actions that occur before a Program is initiated, or after a Program terminates. Invoices submitted to Company and payments made to You shall be based on the Actions and corresponding Bounties as reported by Company, based on online or offline reporting of the Data by Company. Company and Advertisers will not be responsible to compensate You for Actions that are not recorded due to Your error.

5.8 Company will not pay any interest or late payment fees on any Bounties or other payments held or withheld by Company, unless Company otherwise explicitly agrees in writing to do so.

## 6. **Representations and Warranties.**

6.1 You represent and warrant that Your Media are in compliance with all applicable laws and do not contain or promote, nor link to, another website that contains or promotes, libelous, defamatory, abusive, violent, prejudicial, obscene, sexually explicit or illegal content.

6.2 You represent and warrant that all email associated with any Program sent by You shall include all features required by the laws and regulations of the United States of America and of the several states (including but not limited to the CAN-SPAM Act of 2003) and the laws of the jurisdiction where You are located and to which you are sending email. You represent and warrant that all emails associated with any Program sent by You shall contain a physical mailing address for You where recipients may contact You. You further represent and warrant that all email associated with any Program sent by You shall include a functioning reply-to address allowing recipients to opt-out of further communications from You or from the Advertiser. You represent and warrant that upon receipt of an opt-out message from a recipient, that you will cease any further email communication with that email address within ten (10) calendar days, unless the recipient subsequently affirmatively requests that such email communication be initiated again.

6.3 You represent and warrant that the recipients of all email addresses used by you in connection with any Program have manifested affirmative consent to receive commercial emails from You. You represent and warrant that none of the email addresses of any emails sent by you in connection with any Program were obtained by You through email harvesting or dictionary attacks, whether by You or by a third party.

6.4 You represent and warrant that You will not use fraud or deceit when marketing a Program or presenting a Program to consumers.

6.5 You represent and warrant that You will display the creative content of a Program exactly as it appears on the Program and will not alter any creative that has been submitted to the Site without the express written authorization of Company.

6.6 You represent and warrant that you will not post any specific messages relating to Company or any Program to newsgroups, chat rooms, bulletin boards, blog comments, that utilize social website internal email systems, or any other places unless expressly approved in writing from Company. You may post messages which are generic in nature and do not mention any specific client or offer, which are expressly approved in writing from Company.

6.7 You represent and warrant that You will not promote any Programs via a website or link to other websites that contain any pornographic, racial, ethnic, political, software pirating (e.g. Warez) or hacking, hate-mongering, or otherwise objectionable content.

6.8 You represent and warrant that all of Your efforts associated with Company and any of its Programs comply with the laws of the United States and of the several states, and any other laws of any other jurisdictions which are applicable to You. You will not engage in or promote any illegal activities of any kind in association with Company or any of its Programs.

6.9 You represent and warrant that You own or have the legal right to use and distribute all content, copyrighted material, products, and services displayed on Your Media. You further represent and warrant that you have the right, power, and authority to enter into this Agreement and grant the rights specified herein.

6.10 You represent and warrant that You will not attempt in any way to alter, modify, eliminate, conceal, or otherwise render inoperable or ineffective the Site tags, source codes, links, pixels, modules or other data provided by or obtained from Company that allows Company to measure ad performance and provide its service ("Site Data"). If instructed to do so by Company and/or if this Agreement terminates, You will immediately remove and discontinue the use of any Site Data.

6.11 You acknowledge that Company does not represent, warrant, or make any specific or implied promises as to the successful outcome, or any outcome, of any Program or Programs.

6.12 You acknowledge that if any errors or undesirable results occur to You or a third party that do not result from the willful misconduct by Company, gross neglect of Company, or breach of this Agreement by Company, then Company shall not be responsible for any losses or damages You may incur and You may not be compensated for said losses or damages by Company.

6.13 If You are notified that fraudulent activities may be occurring on your Media, and You do not take immediate actions to stop the fraudulent activities, then You are responsible for all associated costs and legal fees resulting from these fraudulent activities that may be incurred by Company or Advertisers. Such responsibility includes, but is not limited to, the indemnity provided by You in Section 9, below.

6.14  You represent and warrant that you will comply with CASL and all other Canadian legislation and associated regulations that relate to email and electronic communications. Compliance includes, but is not limited to, obtaining express consent for the receipt of electronic messages prior to your sending them to residents of Canada and advising Canadian residents of the right to opt-out of future communications.

6.15  If You have affiliates, publishers, or other agents performing any portion of Your obligations or services under this Agreement, You represent and warrant that all such affiliates, publishers, or other agents will agree or have agreed to substantially similar prohibitions on their conduct as are contained in this Agreement.  You further agree that the acts or omissions of any of Your affiliates, publishers, or other agents shall be as if those acts or omissions were Your acts or omissions for all purposes under this Agreement (including such times as the agent may act outside of their scope of agency), and You shall in all other ways be obligated as a principal for the acts or omissions of your agents.

7. **Termination.**

7.1 This Agreement shall commence upon Your acceptance and remain in effect until terminated. This Agreement may be terminated by either Party upon three (3) calendar days' notice, or immediately by Company if Company reasonably determines You breached this Agreement. This Agreement shall terminate immediately upon the windup and dissolution or insolvency of either Party, whether voluntary or not.

7.2 Company reserves the right, in its sole and absolute discretion, to immediately terminate a Program or your participation in a Program at any time for any reason. Company also reserves the right, in its sole and absolute discretion, to remove any advertisements related to Company or to a Program at any time for any reason. Company further reserves the right to immediately terminate Your access to the Site at any time without notice.

7.3 Notice of termination of this Agreement may be provided in written form, and may be delivered via letter, facsimile, or e-mail (though any writing expressing the termination of this Agreement is sufficient) and will take effect three (3) calendar days after the notice is sent, or immediately upon receipt by Affiliate, whichever occurs first. All Bounties due to You will be paid during the next billing cycle. If You commit any violations of Section 3 of this Agreement, then all payments owed to You are forfeited, as determined in the sole and absolute discretion of Company.

7.4 The terms of Sections 4, 8, 9, 10, 12, 14 and 15 and any other provision that would reasonably be interpreted to survive termination shall remain in full force and effect after termination of this Agreement. All payment obligations of either party to the other shall survive until fully performed, unless such obligation is expressly waived herein.

8. **Confidential Information; Non-Disclosure.**

8.1 All information submitted by end-user customers pursuant to a Program is proprietary to and owned by Company or its affiliates. Such customer information is confidential and may not be disclosed by You. In addition, You acknowledge that all non-public information, data and reports received from Company hereunder or as part of the services hereunder is proprietary to and owned by Company ("Confidential Information").

8.2 You agree not to disclose the terms of any Program or Programs, including the CPA value, to any third party without the express written consent of Company, and that such constitutes Confidential Information.  You agree not to disclose Your Site access information (e.g. Your username and password) to any third party that is not an employee, officer, or director of You, and that Your Site access information constitutes Confidential Information.

8.3 All Confidential Information is or may be protected by copyright, trademark, trade secret and other intellectual property law, as appropriate. You agree not to reproduce, disseminate, sell, distribute or commercially exploit any proprietary or onfidential information in any manner. These non-disclosure obligations shall survive the termination of this Agreement for a period of five (5) years.

8.4 This section does not bind Company or You in the event such information is required to be disclosed by operation of law. If a request is made of You to disclose such information, you must immediately inform Company via written notice sufficiently promptly to allow Company to seek a Protective Order prior to the time commanded to produce or disclose such Confidential Information, and You agree to cooperate in whatever way Company requests to attempt to protect that information from disclosure by operation of law.

## 9. **Limitation of Liability; Disclaimer of Warranty.**

9.1 IN NO EVENT SHALL COMPANY BE LIABLE FOR ANY DAMAGES OF ANY KIND ARISING FROM YOUR USE OF THE SITE (INCLUDING YOUR INABILITY TO ACCESS OR USE THE SITE), OPERATION OF A PROGRAM (INCLUDING YOUR INABILITY TO ACCESS OR USE AN ADVERTISER'S WEBSITE), OR YOUR DISPLAY OF ANY PROGRAM CREATIVE ON YOUR MEDIA, INCLUDING BUT NOT LIMITED TO BROKEN IMAGES, UNAVAILABILITY OF SOME OR ALL OF THE SITE OR OTHER SERVICES PROVIDED BY COMPANY), SPECIAL, INDIRECT, INCIDENTAL, LOST PROFIT, PUNITIVE AND CONSEQUENTIAL DAMAGES, EVEN IF COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

9.2 THE INFORMATION, CONTENT AND SERVICES ON THE SITE ARE PROVIDED ON AN "AS IS" BASIS WITH NO WARRANTY. YOU USE THE SITE AND RUN PROGRAMS AT YOUR OWN RISK. TO THE MAXIMUM EXTENT PERMITTED BY LAW, COMPANY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, WITH RESPECT TO THE OPERATION OF THE SITE, THE INFORMATION, SERVICES, AND CONTENT INCLUDED ON THE SITE AND PROVIDED BY COMPANY, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. COMPANY DOES NOT REPRESENT OR WARRANT THAT THE INFORMATION ON THIS SITE OR PROVIDED BY COMPANY IS ACCURATE, COMPLETE OR CURRENT.

9.3 IN THE EVENT THAT COMPANY IS DETERMINED TO HAVE DAMAGED YOU, WHETHER THROUGH BREACH OF THIS AGREEMENT OR OTHERWISE, YOU AGREE THAT THE MAXIMUM LIABILITY COMPANY SHALL INCUR TO YOU IS LIMITED TO THE SUM OF THE BOUNTIES COMPANY PAID TO YOU IN THE SIX MONTHS PRIOR TO THE ACTS OR OMISSIONS CAUSING SUCH LIABILITY. IF THIS AGREEMENT BETWEEN YOU AND COMPANY WAS EXECUTED LESS THAN SIX MONTHS PRIOR TO THE ACTS OR OMISSIONS CAUSING SUCH LIABILITY, THAN THE MAXIMUM LIABILITY COMPANY SHALL INCUR TO YOU IS LIMITED TO THE AVERAGE DAILY BOUNTY EARNED BY YOU DURING THE PERIOD FOLLOWING EXECUTION OF THE AGREEMENT MULTIPLIED BY ONE HUNDRED EIGHTY (180).

## 10. **Indemnity.**

10.1 You shall indemnify, defend and hold Company (including Company's parents, successors, subsidiaries, officers, directors, shareholders, employees, and other agents) harmless from and

against any and all claims, allegations, liabilities, costs, expenses (including reasonable attorneys' fees and reasonable other professionals' fees) or other damages by third parties arising out of Your: (a) improper use of the Site; (b) improper operation of a Program; (c) breach or violation of this Agreement; or (d) willful misconduct or gross negligence not covered by the terms of this Agreement. Company shall indemnify, defend and hold You harmless from and against any and all claims allegations, liabilities, costs, expenses (including reasonable attorneys' fees) or other damages by third parties arising out of any actual infringement of intellectual property rights resulting from Your unaltered display of Company's advertising creative provided in connection with operating a Program, so long as Your display of Company's advertising creative does not breach this Agreement.

## 11. **Assignment and Jurisdiction.**

11.1 Company may assign this Agreement to a subsidiary or business successor without notice to You or your consent. You may not assign this Agreement without the prior written consent of Company, which shall not be unreasonably withheld. This Agreement shall be construed and governed by the law of the Commonwealth of Pennsylvania. You expressly consent to the exclusive venue and personal jurisdiction of the state and federal courts located in Cumberland County, Pennsylvania for any actions arising from or relating to this Agreement.

## 12. **Severability.**

12.1 If any provision of this Agreement is held to be invalid, illegal or unenforceable for any reason, such invalidity, illegality or unenforceability shall not effect any other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had not been contained herein.

## 13. **Force Majeure.**

13.1 Neither Party shall be liable to the other by reason of failure or delay in the performance of its obligations hereunder on account of Acts of God, fires, storms, war, terrorism, governmental action, labor conditions, riots, earthquakes, floods, other natural disasters, interruption in Internet service, or any other cause which is beyond the reasonable control of such Party.

## 14. **Attorneys' Fees and Other Collection Costs.**

14.1 Company shall be entitled to an award of its reasonable costs and expenses, including attorneys' fees, other professionals' fees, and other collections costs, and prejudgment interest at the maximum legal rate, in any action or proceeding against You arising out of this Agreement. You shall be entitled to an award of your reasonable costs and expenses, including attorneys' fees, in any action or proceeding arising out of this Agreement resulting from the gross negligence or willful misconduct of Company.

## 15. **Miscellaneous.**

15.1 This Agreement contains the sole and entire agreement and understanding between the Parties relating to the subject matter herein, and merges all prior and contemporaneous discussions, contracts, understandings and agreements, whether through officers, directors, salespersons, employees or consultants, unless otherwise stated in a writing signed by both Parties. No amendment to or modification of this Agreement or any Program shall be valid or binding on the Company unless it is signed by the Company's President.  Each Party is an independent contractor and not a partner, joint venturer or employee of the other. All notices to You shall be sent to the addresses submitted by You when signing up for the service by certified mail, fax, email or courier. You shall send all notices to Company to the contact information listed on the Site.

15.2 Company reserves the right to change any conditions of this Agreement at any time, with or without notice. Such changes shall affect all future use or uses of Site or Programs by You, and your future use of the Site or Company's Programs constitute affirmative consent to the new agreement.

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MUTUAL MINDS, LLC, a California limited liability company,<br><br>        Plaintiff,<br><br>    v.<br><br>TRON SHELLY, an individual; RICK MILLER, an individual; iDRIVE INTERACTIVE, LLC, a Pennsylvania limited liability company; PARENTS FOR CHEAPER LIVING, LLC, a Virginia limited liability company; and DOES 1 through 10, inclusive,<br><br>        Defendants. | Case No. 1:16-cv-00541-JEJ<br><br>The Hon. John E. Jones III |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that she has electronically filed a true and correct document entitled *Defendants Tron Shelly, Rick Miller, iDrive Interactive, LLC, and Parents for Cheaper Living, LLC's Motion to Dismiss the First Amended Complaint, Brief in Support thereof and proposed Order*, which is available for viewing and downloading from the United States District Court for the Middle District of Pennsylvania Electronic Case Filing System (ECF) on July 8, 2016.

KRONENBERGER ROSENFELD, LLP

Leah Vulić
Paralegal to Karl S. Kronenberger

1