IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MUTUAL MINDS, LLC, a | : | |
| California limited liability | : | NO.: 1:16-cv-00541 |
| company, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | (Jones, J.) |
| | : | (Saporito, M.J.) |
| TRON SHELLY, an individual; | : | |
| RICK MILLER, an individual; | : | |
| iDRIVE INTERACTIVE, LLC, | : | |
| a Pennsylvania limited liability | : | |
| company; PARENTS FOR | : | |
| CHEAPER LIVING, LLC, a | : | |
| Virginia limited liability | : | |
| company; and DOES 1 through | : | |
| 10, inclusive, | : | |
| Defendants. | : | |

## MEMORANDUM

This matter is before us on the motion to bifurcate discovery (Doc. 46) filed by the defendants, iDrive Interactive, LLC and Parents for Cheaper Living, LLC (collectively, the "defendants"). The plaintiff, Mutual Minds, LLC, in its first amended complaint (Doc. 25), alleges that the defendants misappropriated its trade secrets in violation of the Pennsylvania Uniform Trade Secrets Act, 12 Pa. Cons. Stat. § 5301 ("PUTSA") by using information disclosed to the defendants in connection

with their advertising relationship to establish competing websites. The motion has been fully briefed and is ripe for disposition. For the reasons set forth below, the motion will be denied.

I.    <u>FACTS</u>

As we write exclusively for the parties, the facts of this litigation are known to them. We will recite only those facts necessary for a resolution of the motion. In its first amended complaint (Doc. 25), the plaintiff has alleged that it "creates and develops online communities for people that have common interests and provides those individuals with content targeted to their demographic." (Doc. 25 ¶¶ 3,15). Further, the plaintiff generates revenue from designated websites by partnering with advertising networks to place advertisements on plaintiff's websites. (*Id.*) From 2011 to 2014, the plaintiff and defendant, iDrive, entered into a business relationship whereby plaintiff would post iDrive advertisements on its websites. The plaintiff would receive a portion of the revenue generated through users clicking on iDrive advertisements from the plaintiff's websites and taking action such as purchasing the advertised products. (*Id.* ¶18). The process is called "conversion." (*Id.* ¶1b). The

conversion rates of advertisements reveal which advertisements generate the most revenue.    (*Id.* ¶1c). Conversion rates are used to determine which attributes of plaintiff's websites are most attractive to users.

Incident to its business relationship with the plaintiff, iDrive was given access to "a detailed description of the plaintiff's target demographics, information regarding Mutual Minds members, such as members' unique IP addresses, and detailed information regarding member preferences and the type of advertisements most likely to lead to sales as reflected in conversion rates, earnings-per-click data, complete questionnaire information for each member that converted into a sale, and back-end enrollment statistics" (the "trade secrets").   (*Id.* ¶ 20). This information comprises the trade secrets that plaintiff alleges defendants misappropriated.

The plaintiff asserts that it generated these trade secrets "through its own testing, know-how, and efforts related to website design, content placement, advertisement placement, and other things." (*Id.* ¶ 21). Much of the information was not submitted to iDrive by end-user customers, and plaintiff disclosed this information to iDrive only for the purposes of

iDrive's advertisement delivery. (*Id.* ¶ 21, 23). The plaintiff stored the trade secrets "on secure, password protected servers, implement[ed] policies preventing unauthorized disclosure to third parties, and restrict[ed] access to the trade secrets to only those with a need to know." (*Id.* ¶ 24). Further, plaintiff asserts that "the trade secrets were developed through plaintiff's expenditure of significant time, effort, money, and resources" and that the use of this information generated hundreds of thousands of dollars for the Defendants. (*Id.* ¶¶ 24, 22).

During the summer of 2014, Rick Miller, co-founder and president of iDrive, "suggested that iDrive copy" the plaintiff's websites. (*Id.* ¶ 25). While still in an advertising relationship with the plaintiff, and unbeknownst to it, defendants established competing websites that "target[s] the very demographics [plaintiff] targets, communicate[s] with members the same way as [plaintiff], and cop[ies] in wholesale fashion the source code of the Websites and the timing, type, and placement of content." (*Id.* ¶ 26). One example of defendants' websites is Parents for Cheaper Living, which targets single parents in the same manner of plaintiff's website, www.spaoa.org. (*Id.* ¶ 26). The plaintiff confronted

Tron Shelly, co-founder and Executive Vice President of iDrive, who "admitted that iDrive had always wanted to own [its] own site, that iDrive had copied [plaintiff's] website" and "that there was nothing that [plaintiff] could do about it." (*Id.* ¶ 29).

During the time that defendants established competing websites, defendants required that plaintiff consent to new business terms for the advertising arrangement, and refused plaintiff access to iDrive's online portal unless plaintiff assented to new terms. (*Id.* ¶ 27).

Further, the plaintiff alleged that conversion rates and consumer information were given to defendant, iDrive, pursuant to a business relationship that the plaintiff regarded as confidential. (Doc. ¶¶ 25, 20, 23). The plaintiff alleged that the defendants used the plaintiff's trade secrets to develop a competing website without the plaintiff's consent. *(Id.* ¶ 26). The plaintiff further alleged that the defendants' use of the trade secrets caused website traffic to be diverted from plaintiff's websites and to the defendants' websites, resulting in lost revenue. (*Id.* ¶ 32).

The defendants filed the instant motion on January 24, 2017, requesting bifurcated discovery. They believe that discovery should be

bifurcated into two phases: (1) the existence and scope of plaintiff's trade secrets, and (2) whether there was misappropriation by defendants and resulting damage to the plaintiff. (Doc. 47, at 2). Further, the defendants claim that there is good cause for bifurcation because (1) the plaintiff has not identified its trade secrets; (2) bifurcation will allow for an expedient and efficient resolution of the case; (3) it will avoid prejudice to the defendants by avoiding unnecessary disclosure of the defendants' sensitive and trade secret information; and (4) the plaintiff will not be prejudiced as the proposed phases involve distinct facts.

The plaintiff opposes the defendants' motion for bifurcation contending that (1) it has adequately described its trade secrets; (2) it will be prejudiced by needlessly duplicating legal fees; (3) granting the motion will invite unnecessary discovery disputes; (4) it will potentially delay trial on the merits; and bifurcation of discovery would not secure the just, speedy, and inexpensive determination of this action under Fed. R. Civ. P. 1. (Doc. 48, at 1-2).

## II.   LEGAL STANDARDS

We are guided by Fed. R. Civ. P. 26(b) which is set out as follows:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

In addition, Fed. R. Civ. P. 26(c)(1)(G) permits a party from whom discovery is sought to move for a protective order upon good cause shown to protect a party from requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way.  A decision to bifurcate discovery is a matter that falls within the discretion of the court and is to be decided on a case by case basis. *Barr Laboratories v. Abbot Laboratories,* 978 F. 2d 98, 115 (3d Cir. 1992).

## III.   DISCUSSION

We begin our analysis with the necessary elements to establish a plausible claim for relief under the PUTSA. The plaintiff must allege: "(1)

the existence of a trade secret; (2) communication of the trade secret pursuant to a confidential relationship; (3) use of the trade secret, in violation of that confidence; and (4) harm to the plaintiff." *Moore v. Kulicke & Soffa Indus.,* 318 F.3d 561, 566 (3d Cir. 2003) (summary judgment decision reciting elements of PUTSA).

As the defendants urge us to grant bifurcation of discovery because they claim that the plaintiff has failed to adequately identify the existence of a trade secret, we look to the district court's decision denying the defendants' motion to dismiss. (Doc. 35).  In ruling upon the defendants' motion to dismiss the first amended complaint (Doc. 31), the district court denied the motion as to the plaintiff's misappropriation of its trade secrets count under the PUTSA. (Doc. 35). There, the court held that the plaintiff pled a sufficiently detailed description of the trade secrets, including conversion rates and consumer information. (Doc. 25 ¶20; Doc. 3, at 10). The plaintiff described the trade secrets as follows:

> The Trade Secrets include, but are not limited to, a detailed description of Mutual Minds' target demographics information regarding Mutual Minds members, such as members' unique IP addresses and detailed information regarding member preferences and the types of advertisements most likely to lead to sales

> as reflected in conversion rates, earnings-per-click data, complete questionnaire information for each member that converted into a sale, and back-end enrollment statistics.

(Doc. 25 ¶20).

Under the PUTSA, a trade secret is defined as follows: "Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."   12 Pa. Cons. Stat. Ann. § 5302.  Where the state of the record failed to establish whether the information purportedly taken does, in fact, constitute trade secrets, courts are disinclined to make such a determination without the benefit of a fully developed record. *See Cunningham Lindsey v. Bonnani*, No. 13-cv-2528, 2014 WL 1612632 (M.D. Pa. Apr. 22, 2014); *Alpha Pro Tech, Inc. v. VWR Int'l LLC*, 984 F. Supp. 2d 425, 447 (E.D. Pa. 2013). To prevail under the PUTSA, it is the plaintiff's burden to demonstrate the existence of a trade secret, and that

determination requires discovery. *Hecht v. Baby Age.com,* No. 10-cv-724, 2010 WL 3940882, at *13 (M.D. Pa. Oct. 6, 2010); *Advanced Fluid Systems, Inc. v. Huber,* 28 F. Supp. 3d 306, 325 (2014).

The thrust of the defendants' argument is that bifurcation of discovery is the best means for a just, speedy, and efficient resolution of this action as limited discovery in the proposed first phase (i.e. the identity of plaintiff's trade secrets) will confirm whether the plaintiff can meet the threshold issue of having trade secrets. (Doc. 47, at 9). At the conclusion of the proposed first phase of discovery, the defendants intend to file a motion for summary judgment. (*Id.* at 11). If we grant bifurcation of discovery as proposed by the defendants, and if the plaintiff later defeats a defense motion for summary judgment, the parties and counsel would be required to conduct discovery a second time, and in many instances with the same witnesses. The defendants could possibly file another motion for summary judgment at the conclusion of the proposed second phase of discovery thereby increasing litigation costs. We find that bifurcation may increase the expenses of this litigation as well as prolong an otherwise potentially protracted litigation.

Further, the defendants contend that without bifurcation, they will be unduly prejudiced because their trade secrets and sensitive information will be unnecessarily disclosed. We do not agree.  Discovery is usually conducted by the parties in private, outside of the public's view.  *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984); *cf. Leucadia, Inc. v. Applied Extrusions Techs., Inc.*, 998 F.2d 157, 165 (3d Cir. 1993) ("[T]here is a presumptive [common law] right to public access to all material filed in connection with non discovery pretrial matters, . . . . but no such right as to discovery motions and their supporting documents."). A party seeking a protective order over discovery materials must demonstrate that "good cause" exists for the protection of that material. Fed. R. Civ. P. 26(c); *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994); *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995). "Good cause" is established when it is specifically demonstrated that disclosure will cause a clearly defined and serious injury. *Pansy*, 23 F.3d at 786; *Glenmede Trust Co.*, 56 F.3d at 483.

On June 29, 2016, the court, having found good cause, approved a confidentiality stipulation and protective order (the "protective order")

11

signed by counsel for the parties. (Doc. 30). The protective order permits the parties to designate certain information as either "Confidential" or "Highly Confidential-Attorneys' eyes only."  (Doc. 30 ¶3).  Excluded from these restrictions is information or tangible items which are or were within public knowledge through lawful means. (*Id.*).

Information may be designated "Confidential" upon the good faith belief that the information contains trade secrets, know-how, proprietary data, other technical, commercial, business, or financial information. Other sensitive information may be designated as "Highly Confidential-Attorneys' Eyes Only" if it contains information that meets the requirements for the designation as "Confidential" and is extremely sensitive in nature. Information in that category includes trade secrets of either party, consumer information (including members' unique IP addresses, conversion rates, and underlying data comprising those conversion rates). (*Id.* ¶5). All information marked "Confidential," and "Highly Confidential-Attorneys' Eyes Only" shall be used solely in this action, including all appeals, and shall not be used in any business or competitive purpose, or in any other litigation or legal proceeding. (*Id.* at

¶14). Thus we find that, the protective order contains many safe-guards and provisions designed to protect the confidentiality and integrity of the marked information. If the parties contend that a violation of the protective order occurred, they are free to bring the matter before the court if they are unable to resolve the dispute. Therefore, we will deny the motion to bifurcate discovery.

An appropriate order follows.

<u>**s/ Joseph F. Saporito, Jr.**</u>
JOSEPH F. SAPORITO, JR.
United States Magistrate Judge

Dated:  March 8, 2017